## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

TORRELL BROWN                                                    CIVIL ACTION

VERSUS                                                               NO. 19-1291

DARREL VANNOY, WARDEN                               SECTION: "G"(3)

## REPORT AND RECOMMENDATION

Petitioner, Torrell Brown, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.  For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On December 16, 2009, after a three-day jury trial, petitioner was convicted of second degree murder and attempted second degree murder under Louisiana law.[1]  On February 8, 2010, he was sentenced to a term of life imprisonment on the murder conviction and to a term of fifty years' imprisonment on the attempted murder conviction.  It was ordered that his sentences be served concurrently and without benefit of probation, parole, or suspension of sentence.[2]  On March 23, 2012, the Louisiana First Circuit Court of Appeal affirmed his convictions and sentences.[3]  The Louisiana Supreme Court denied his related writ application on September 28, 2012,[4] and the United States Supreme Court denied his petition for a writ of certiorari on February 25, 2013.[5]

On December 30, 2013, petitioner, through counsel, filed an unsigned application for post-conviction relief with the state district court;[6] on January 21, 2014, a signed copy of the application

---

[1] State Rec., Vol. 2 of 6, transcript of December 16, 2009, p. 70; State Rec., Vol. 1 of 6, minute entry dated December 16, 2009; State Rec., Vol. 1 of 6, jury verdict forms.
[2] State Rec., Vol. 2 of 6, transcript of February 8, 2010.
[3] State v. Brown, No. 2011 KA 1463, 2012 WL 1012418 (La. App. 1st Cir. Mar. 23, 2012); State Rec., Vol. 2 of 6.
[4] State v. Brown, 98 So. 3d 827 (La. 2012); State Rec., Vol. 2 of 6.
[5] Brown v. Louisiana, 568 U.S. 1198 (2013).
[6] State Rec., Vol. 2 of 6.

was filed.[7]  That application was denied in part on February 28, 2014,[8] and, after four evidentiary hearings,[9] the remaining claims were then denied on January 31, 2017.[10]  His related writ applications were likewise denied by the Louisiana First Circuit Court of Appeal on October 30, 2017,[11] and by the Louisiana Supreme Court on January 14, 2019.[12]

Petitioner thereafter filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254,[13] and the state filed an answer arguing that the application was untimely.[14]  The undersigned United States Magistrate Judge issued an order noting an obvious error in the state's answer and ordered that a supplemental answer be filed.[15]  The state then filed a supplemental answer conceding that the application was in fact timely but arguing that petitioner's claims have no merit.[16]  After reviewing the application, the undersigned determined that it was necessary to review the audiotape of petitioner's statement which was introduced at trial but not included within the copy of the state court record supplied to this Court.  Therefore, the state was ordered to produce a certified copy of that audiotape;[17] the state complied, and the audiotape has been filed into this federal record.[18]

---

[7] State Rec., Vol. 2 of 6.

[8] State Rec., Vol. 2 of 6, Judgment and Reasons for Judgment dated February 28, 2014.

[9] See State Rec., Vol. 3 of 6, transcripts of July 29, 2015, January 13, 2016, April 19, 2016, and August 22, 2016.

[10] State Rec., Vol. 3 of 6, Judgment and Reasons for Judgment dated January 31, 2017.

[11] State v. Brown, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6.

[12] State ex rel. Brown v. State, 261 So. 3d 768 (La. 2019); State ex rel. Brown v. State, 260 So. 3d 1216 (La. 2019); State Rec., Vol. 3 of 6.

[13] Rec. Doc. 1.

[14] Rec. Doc. 9.

[15] Rec. Doc. 10.

[16] Rec. Doc. 11.  The Court notes that state's supplemental answer on the merits was only eleven pages long and virtually devoid of meaningful analysis.  Such cursory responses are neither appropriate nor helpful to the Court.  See, e.g., Foots v. Louisiana, 793 F.2d 610, 612 (5th Cir. 1986).

[17] Rec. Doc. 12.

[18] Rec. Docs 13 and 14.

# I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court), cert. denied, 140 S. Ct. 2676 (2020).  The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  White v. Woodall, 572 U.S. 415, 426 (2014).  However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  In other words,

the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

Further, the Supreme Court has expressly cautioned:

Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – *and federal courts* – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added). The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. Woodall, 572 U.S. at 417.

## II. Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

Several days prior to March 30, 2008, Cortez Watkins ("Watkins") met defendant for the first time at the mobile home where defendant lived with his

girlfriend, on Patrick Drive in Schriever, Louisiana. At the time of this visit, Watkins was accompanied by his mother, Darlene Watkins ("Darlene"), and his mother's boyfriend, Leslie Ross ("Ross"). Watkins, Darlene, and Ross were attempting to find Ross's sister, Dawn Ross ("Dawn"), who lived in the apartment complex across the street from defendant and who they knew to be an acquaintance of defendant's girlfriend. Defendant answered the door and indicated that Dawn was not at his mobile home. Defendant and Watkins then had a brief conversation wherein defendant indicated that he sold ecstasy and Watkins indicated that he would be interested in buying ecstasy from defendant in the future, when he had money to do so. After this conversation, Watkins, Darlene, and Ross left defendant's mobile home.

On Saturday, March 29, 2008, Watkins, Darlene, and Ross began to drink beer around 10:00 a.m. or 11:00 a.m. They then visited a bar and shot pool for approximately four to five hours before leaving around 10:00 p.m. to pick up Dawn from a nursing home where she worked. Watkins, Darlene, Ross, and Dawn stopped briefly at Dawn's apartment in order for Dawn to change her clothes, and they all soon left again to visit a club in Thibodaux. They stayed at the club until it closed at 2:00 a.m. on Sunday, March 30, 2008, at which point they returned to Dawn's apartment. Upon arriving at Dawn's apartment complex, Watkins noticed that the light in defendant's mobile home was still on, so he and Ross went to defendant's mobile home to buy two ecstasy pills. At that time, defendant also gave Ross a phone number that they could call before coming over to buy ecstasy in the future. Watkins and Ross returned to Dawn's apartment, where they took the ecstasy pills and continued drinking.

Around 8:30 a.m. on Sunday morning, Watkins and Ross decided to visit defendant's mobile home in order to buy more ecstasy. Prior to their visit, Darlene called defendant to let him know that Watkins and Ross would be coming to his mobile home. As Watkins and Ross approached defendant's mobile home, Watkins heard footsteps approaching the front door. Soon thereafter, Watkins saw defendant's front door open, revealing a glimpse of a gun, and defendant began shooting. Watkins felt a bullet enter his stomach, and he began to run away from defendant before he eventually fell to the ground unconscious. Watkins also suffered less-severe gunshot wounds to his right arm and leg. The gunshot wound to Watkins's abdomen caused extensive bleeding and resulted in injuries to his liver, large intestines, small intestines, and pancreas, requiring extensive surgeries to correct. Ross suffered gunshot wounds to his left arm and chest, the latter of which penetrated his heart and caused him to bleed to death where he fell, in the middle of Patrick Drive. No witnesses saw Watkins or Ross carrying any weapons on their approach to defendant's mobile home, nor did police find any weapons in the vicinity of the incident.

After the shooting, defendant fled the scene, but he later turned himself in to the police. Defendant gave a statement to the police in which he admitted to shooting at both Watkins and Ross, but he claimed that he was scared of the men and acted in self-defense. Defendant did not testify at trial, but his counsel reiterated defendant's claim of self-defense in closing arguments. Defendant was

ultimately found guilty of the second degree murder of Ross and of the attempted second degree murder of Watkins by an 11-1 vote on each count. [19]

### III.  Petitioner's Claims

### A.  Denial of Challenges for Cause

Petitioner's first claim is that the trial court erred in denying his challenges for cause of

Colleen Terhune, Jerome Theriot, and David Rodrigue.  On direct appeal, the Louisiana First

Circuit Court of Appeal denied that claim, holding:

> [D]efendant contends that the trial court erred in denying challenges for cause related to three potential jurors, requiring defendant to exhaust all of his allotted peremptory challenges.
> An accused in a criminal case is constitutionally entitled to a full and complete voir dire examination and to the exercise of peremptory challenges. La. Const. art. I, § 17(A).  The purpose of voir dire examination is to determine prospective jurors' qualifications by testing their competency and impartiality and discovering bases for the intelligent exercise of cause and peremptory challenges. State v. Burton, 464 So.2d 421, 425 (La. App. 1st Cir.), writ denied, 468 So.2d 570 (La. 1985).  A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably implied.  A trial court is accorded great discretion in determining whether to seat or reject a juror for cause, and such rulings will not be disturbed unless a review of the voir dire as a whole indicates an abuse of that discretion. State v. Martin, 558 So.2d 654, 658 (La. App. 1st Cir.), writ denied, 564 So.2d 318 (La. 1990).  A trial court's ruling on a motion to strike jurors for cause is afforded broad discretion because of the court's ability to get a first-person impression of prospective jurors during voir dire.  State v. Brown, 2005-1676 (La. App. 1st Cir. 5/5/06), 935 So.2d 211, 214, writ denied, 2006-1586 (La. 1/8/07), 948 So.2d 121.
> A defendant must object at the time of the ruling on the refusal to sustain a challenge for cause of a prospective juror.  See La. Code Crim. P. art. 800(A). Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and the defendant has exhausted his peremptory challenges.[FN 1]  To prove there has been reversible error warranting reversal of the conviction, the defendant need only show (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges.  State v. Robertson, 92-2660 (La. 1/14/94), 630 So.2d 1278, 1280-81.  It is undisputed that defense counsel exhausted all of his peremptory challenges in this case and that objections were made to the trial court's denial of each challenge for cause.  Therefore, we need only determine the issue of

---

[19] State v. Brown, No. 2011 KA 1463, 2012 WL 1012418, at *1-2 (La. App. 1st Cir. Mar. 23, 2012); State Rec., Vol. 2 of 6.

7

whether the trial judge erred in denying defendant's challenges for cause for any of the three prospective jurors identified by defendant.

> [FN 1] "The rule is now different at the federal level. See United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) (exhaustion of peremptory challenges does not trigger automatic presumption of prejudice arising from trial court's erroneous denial of a cause challenge)." State v. Taylor, 2003-1834 (La. 5/25/04), 875 So.2d 58, 62 n. 2.

The grounds upon which a challenge for cause can be made are set forth in La. Code Crim. P. art. 797, which provides:

> The state or the defendant may challenge a juror for cause on the ground that:
>
> (1) The juror lacks a qualification required by law;
>
> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
>
> (3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
>
> (4) The juror will not accept the law as given to him by the court; or
>
> (5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

Defendant asserts that the trial court erred in denying his challenges for cause of prospective jurors Colleen Terhune, Jerome Theriot, and David Rodrigue.

### Colleen Terhune

Defendant argues that the trial court erred in denying his challenge for cause of prospective juror Colleen Terhune because of her former employment relationship with Juan Pickett, the assistant district attorney who was prosecuting the case.

Terhune was twenty-one years old at the time of trial, and she was working as a waitress while attending college at Nicholls State University. When she was questioned by the trial judge during voir dire, Terhune stated that she knew Pickett because her mother once worked at the law office that he maintained apart from his

8

job as an assistant district attorney. When Pickett later questioned her, Terhune stated that her mother was Pickett's former secretary and that she used to babysit his daughter. However, Terhune said that she did not remember babysitting Pickett's daughter until he brought it up to her during voir dire. Terhune said that her relationship with Pickett would not make any difference in her ability to decide defendant's case fairly.

Defendant cites State v. Fairley, 25,951 (La. App. 2d Cir. 5/4/94), 645 So.2d 213, writs denied, 94-1940 (La. 11/11/94), 645 So.2d 1152 & 94-2909 (La. 3/24/95), 651 So.2d 287, as support for the contention that the trial court erred in denying his challenge for cause to prospective juror Terhune because of her employment relationship with Pickett. In Fairley, the trial court denied a challenge for cause of a prospective juror who worked for the assistant district attorney as a babysitter four days a week, for several years. Fairley, 645 So.2d at 216. The Second Circuit noted that "a significant portion" of the prospective juror's livelihood depended upon the assistant district attorney and that "the nature of her employment ... involve[d] a very personal part of the prosecutor's life." Fairley, 645 So.2d at 216-17. Accordingly, despite the prospective juror's statement that she could follow the law and be impartial, the Second Circuit found that the nature of her employment led to the reasonable conclusion that her employment relationship with the prosecutor would influence the prospective juror's ability to arrive at a fair verdict. Fairley, 645 So.2d at 217.[FN 2]

> [FN 2] On rehearing, however, the Second Circuit found the denial of defendant's challenge for cause as to this prospective juror to be harmless error due to the fact that the jury panel was ultimately completed without her and before defendant would have needed to exercise a peremptory challenge on her. State v. Fairley, 645 So.2d at 221.

The law does not require a jury to be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. It requires only that the jurors be fair and unbiased. See State v. Shelton, 311 So.2d 96, 102 (La. 1979). In the instant case, while it is clear that Terhune knew Pickett by virtue of both her mother's and her own employment by him, the nature of those relationships were not such that it is reasonable to conclude that they would have influenced her in arriving at a verdict. Terhune's mother was his former secretary from his law practice, so she no longer depended on Pickett as a source of income, and she never assisted him in criminal matters. Further, unlike in Fairley, the record in this case reveals that Terhune was herself a former employee of Pickett and, even considering that fact, she had to be reminded that she once babysat his daughter. Compared to the prospective juror from Fairley, who worked for the assistant district attorney four days a week for several years and who presumably derived her main source of income from this employment, the nature of Terhune's employment relationship with Pickett was very limited.

The trial court did not abuse its broad discretion in denying defendant's challenge for cause as to Terhune. Terhune demonstrated a willingness and ability to decide the case impartially according to the law and the evidence, and her

responses as a whole did not reveal facts from which bias, prejudice, or inability to render judgment according to the law could reasonably be inferred.

### Jerome Theriot

Defendant argues that the trial court erred in denying his challenge for cause of prospective juror Jerome Theriot because of his "strong anti-drug sentiments" and because he believed that defendant should testify at trial.

At the time of trial Jerome Theriot was married and employed by International Marine Systems. During voir dire, Theriot revealed to the court that he had a brother who was in jail for a child sex offense and for drug offenses. When Theriot was asked by the court whether he believed that his brother "has gotten what he deserves or do you think he has been railroaded," Theriot replied that his brother got what he deserved. Defense counsel later asked whether anyone believed whether "a person who does drugs deserves whatever harm they come to, any harm at all." Theriot raised his hand and said that he had seen his "share of people with drugs, including [his] brother; and what they bring upon themselves, lot of times comes back to them." He later explained that his brother "abused drugs and due to that, he stole from my parents; and he became a child sex offender. And I have a bad problem with people who use drugs."

Theriot later had the following colloquy with defense counsel and the trial judge:

[Theriot]: The only thing I have is – I already have a feeling that if someone is innocent, they should profess their innocence. And that is just the feeling I have.

[Defense counsel]: Do you understand that there may be reasons a person might not want to testify? For example, maybe he is lacking in education; maybe he doesn't speak very well, and he is afraid of how you would perceive him; would you see that as maybe being a possibility of why somebody would choose not to take the stand?

[Theriot]: Possible.

[Court]: All right, Mr. Theriot –

[Theriot]: Yes?

[Court]: I think it was not this panel, but the last panel, I said that in this case, I am the referee and you are going to be the judge – okay?

[Theriot]: Okay.

[Court]: So you are going to make the decisions. So, as a Judge, you are not a member of the Legislature. The Legislature makes the

law.  There are some laws that I have to enforce in here that I don't like.  And the question is not whether you think that they should testify, but whether if you are told, by the Court, that you are not to take their failure to testify into consideration, whether you can comply with it; whether you like it or not.  Can you?

[Theriot]:  Yes.

[Court]:  Good enough.

Defendant contends that this colloquy highlights the inability of Theriot to recognize defendant's right not to testify at trial.  Defendant also argues that the trial court attempted to rehabilitate Theriot only as to his statements addressing defendant's right not to testify and that it failed to rehabilitate Theriot with reference to his "strong anti-drug sentiments."

If a prospective juror is able, after examination by counsel, to declare to the court's reasonable satisfaction that he is able to render an impartial verdict according to the law and evidence, it is the trial court's duty to deny a challenge for cause.  See State v. Claiborne, 397 So.2d 486, 489 (La. 1981).  In State v. Eastin, 419 So.2d 933, 937 (La. 1982), the trial court denied a challenge for cause against a prospective juror who stated, "I don't like drugs.  I don't like people that use drugs.  I don't like them around me."  The Louisiana Supreme Court found that the trial court did not abuse its discretion in denying the challenge for cause to this juror because, upon further inquiry by the trial court, the juror evidenced an ability to try the case impartially despite his personal distaste for drugs.  Eastin, 419 So.2d at 937.

A review of the record as a whole indicates that the trial court did not abuse its broad discretion in denying defendant's challenge for cause as to Theriot.  Defendant contends that the trial court never rehabilitated Theriot for his anti-drug statements and that there was insufficient rehabilitation for Theriot's statements indicating that defendant should profess his innocence.  However, the record indicates that the trial court did not attempt to immediately rehabilitate any prospective jurors who gave troubling answers during voir dire of the second jury panel.  Instead, the trial court waited until after both the state and defense had completed their respective questionings of the prospective jurors before attempting to rehabilitate any second-panel jurors.  Theriot was the first prospective juror on his panel to be rehabilitated by the trial court, and he informed the trial court that he could apply the law as it was given to him by the court.  Although the issue is a close one, we find that the trial court successfully rehabilitated Theriot and did not abuse its discretion in denying defendant's challenge for cause.

### David Rodrigue

Defendant argues that the trial court erred in denying his challenge for cause of prospective juror David Rodrigue because of his concerns about sitting as a juror on a criminal case and because of his statement that an innocent person should testify.

11

At the time of defendant's trial, Rodrigue was married and a fleet mechanic for Pepsi America. Defense counsel asked as her final voir dire question whether there was anything that the prospective jurors thought she should know before she was finished. In response, Rodrigue had the following colloquy with the trial court and defense counsel:

> [Rodrigue]: David Rodrigue – I have never sat on this type of trial before, so I really couldn't tell you if I could be – you know what I am saying fair or whatever. I just – I don't know. I just don't know – my gut feeling would be – you know, because of my beliefs, more or less – should I say.
>
> [Court]: What's that, sir?
>
> [Rodrigue]: My beliefs – you know – I am just – I don't know if I could handle this. That's what I am saying. You know –
>
> [Court]: You know somebody has got to do it, you know.
>
> [Rodrigue]: Yes, I realize that.
>
> [Court]: We have duties, but we also have – we have rights but we have responsibilities.
>
> [Rodrigue]: But what I am saying is to be fair; that's what I am trying to be honest with you.
>
> [Court]: Yes.
>
> [Defense counsel]: Do you think you could sit here and you could listen and look at the evidence; and listen to the law as the Judge gives it to you, and use that to make a determination? Do you feel that you could do that?
>
> [Rodrigue]: Uhh, I would hope to; yes. I would think I would hope to.
>
> [Court]: Okay, ladies and gentlemen, – Mr. Rodrigue, you are having some doubt as to whether you can do this; right?
>
> [Rodrigue]: Yes, sir.
>
> [Court]: Okay, just answer this question. Would you favor one side or the other, or would you listen to the evidence and make a determination based on what comes from the witness stand?

[Rodrigue]:  I would listen to the evidence, yes.

[Court]:  Okay, that's all I want you to do.

Earlier in defense counsel's voir dire, Rodrigue stated, "I just feel like if you – you know, if you are innocent and all, you want to speak for yourself. You know, and you just have to plead your innocence – you know, that's how I feel about it."

Again, a review of the record of voir dire as a whole indicates that the trial court did not abuse its broad discretion in denying defendant's challenge for cause as to prospective juror Rodrigue.  Although Rodrigue expressed his personal belief that an innocent person should speak for himself and initially declared a doubt in his ability to serve as a juror in this case, the trial court rehabilitated Rodrigue to its satisfaction when Rodrigue stated that he would listen to all of the evidence and make his determination on what came from the witness stand.  The totality of Rodrigue's responses demonstrated a willingness and ability to decide the case impartially according to the law and the evidence, and his responses as a whole did not reveal facts from which bias, prejudice, or inability to render judgment according to the law could reasonably be inferred.  Defendant's counseled assignment of error is without merit.[20]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning reasons.[21]

This claim warrants little consideration in this federal habeas corpus proceeding. Regardless of whether Terhune, Theriot, and Rodrigue should have been excused for cause, which is an issue this Court need not and does not reach, petitioner's claim clearly fails for an entirely different reason:  after the challenges for cause were denied, *defense counsel used peremptory challenges to remove all three individuals from the jury.*[22]  Where, as here, the potential jurors are removed through use of peremptory challenges after the denial of challenges for cause, a petitioner is entitled to federal habeas corpus relief only if he demonstrates that the jury *ultimately selected*

---

[20] State v. Brown, No. 2011 KA 1463, 2012 WL 1012418, *2-6 (La. App. 1st Cir. Mar. 23, 2012); State Rec., Vol. 2 of 6.

[21] State v. Brown, 98 So. 3d 827 (La. 2012); State Rec., Vol. 2 of 6.

[22] State Rec., 1 of 6, Transcript of December 14, 2009, pp. 186-88 and 231.

to try his case was not impartial. <u>Ross v. Oklahoma</u>, 487 U.S. 81, 85-86 (1988). In <u>Ross</u>, the

Supreme Court further expressly noted:

> [W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

<u>Id</u>. at 88 (citations omitted); <u>accord</u> <u>Edwards v. Stephens</u>, 612 F. App'x 719, 722 (5th Cir. 2015)

("[T]he forced use of a peremptory challenge does not rise to the level of a constitutional violation.

Instead, a district court's erroneous refusal to grant a defendant's challenge for cause is only

grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt

or innocence was not impartial." (citation and quotation marks omitted)).

Because defense counsel used peremptory challenges to remove Terhune, Theriot, and

Rodrigue, and because petitioner made no effort to establish that the jury ultimately selected was

not impartial, his claim necessarily fails. <u>Dorsey v. Quarterman</u>, 494 F.3d 527, 533 (5th Cir. 2007);

<u>Lagrone v. Cockrell</u>, No. 02-10976, 2003 WL 22327519, at *12 (5th Cir. Sept. 2, 2003); <u>Arita v.</u>

<u>Cain</u>, Civ. Action No. 11-636, 2011 WL 4738666, at *29 (E.D. La. Aug. 25, 2011), <u>adopted</u>, 2011

WL 4738658 (E.D. La. Oct. 6, 2011), <u>aff'd</u>, 500 F. App'x 352 (5th Cir. 2012); <u>Higgins v. Cain</u>,

Civ. Action No. 09-2632, 2010 WL 890998, at *27 (E.D. La. Mar. 8, 2010), <u>aff'd</u>, 434 F. App'x

405 (5th Cir. 2011), <u>Stoves v. LeBlanc</u>, Civ. Action No. 04-2037, 2010 WL 3523012, at *12 (E.D.

La. Apr. 10, 2009), <u>adopted</u>, 2010 WL 3522957 (E.D. La. Sept. 1, 2010); <u>Wilson v. Cain</u>, Civ.

Action No. 06-890, 2009 WL 2163124, at *12 (E.D. La. July 16, 2009), <u>aff'd</u>, 641 F.3d 96 (5th

Cir. 2011).

That result is not changed by the fact that Louisiana state law provides relief when a

defendant's challenge for cause is erroneously denied and the defendant exhausts all of his

peremptory challenges.[23]  "Because that is a protection afforded only by *state* law, a violation of that protection does not warrant federal relief."  Lane v. Vannoy, Civ. Action No. 19-3449, 2020 WL 2140627, at *16 (E.D. La. Mar. 9, 2020), adopted, 2020 WL 2128577 (E.D. La. May 5, 2020); accord Lovell v. Vannoy, Civ. Action No. 17-5836, 2018 WL 3104182, at *5 (E.D. La. Apr. 2, 2018), adopted, 2018 WL 3094248 (E.D. La. June 21, 2018); Hebert v. Vannoy, Civ. Action No. 17-2784, 2017 WL 6989108, at *7 (E.D. La. Dec. 20, 2017), adopted, 2018 WL 466167 (E.D. La. Jan. 16, 2018).  Federal habeas corpus relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice.  28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983).

### B.  Batson Violation

Petitioner next claims that the prosecutor exercised peremptory challenges in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79 (1986).  On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> [D]efendant argues that the trial court erred in denying his Batson[FN 3] challenge, finding that the defense failed to establish a pattern of racial discrimination.  In his second assignment of error, defendant contends that the state violated his "equal protection rights under the Sixth and Fourteenth Amendments by its use of peremptory challenges to strike three African Americans from the jury."  Because these *pro se* assignments of error are related, we address them together.
>
>     [FN 3]  Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
>
> In Batson v. Kentucky, 476 U.S. 79, 96-98, 106 S.Ct. 1712, 1723-24, 90 L.Ed.2d 69 (1986), the United States Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause.  State v. Mitchell, 99-0283 (La. App. 1st Cir. 6/22/01), 808 So.2d 664, 669.  Under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances

---

[23] See State v. Taylor, 875 So. 2d 58, 62 (La. 2004) ("In order for a defendant to prove reversible error warranting reversal of both his conviction and sentence, he need only show the following: (1) erroneous denial of a challenge for cause; and (2) use of all his peremptory challenges.  Prejudice is presumed when a defendant's challenge for cause is erroneously denied and the defendant exhausts all his peremptory challenges.  An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error." (citations and footnote omitted)).

which raise an inference that the prosecutor used his peremptory challenges to exclude potential jurors on account of their race. State v. Tilley, 99-0569 (La. 7/6/00), 767 So.2d 6, 12, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). The combination of factors needed to establish a prima facie case are: (1) the defendant must demonstrate that the prosecutor's challenge was directed at a member of a cognizable group; (2) the defendant must then show the challenge was peremptory rather than for cause; and (3) finally, the defendant must show circumstances sufficient to raise an inference that the prosecutor struck the prospective juror on account of race. State v. Myers, 99-1803 (La. 4/11/00), 761 So.2d 498, 501.

The defendant may offer any facts relevant to the question of the prosecutor's discriminatory intent. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor during voir dire that support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empanelled, and any other disparate impact upon the suspect class that is alleged to be the victim of purposeful discrimination. State v. Rodriguez, 2001-2182 (La. App. 1st Cir. 6/21/02), 822 So.2d 121, 128, writ denied, 2002-2049 (La. 2/14/03), 836 So.2d 131.

No formula exists for determining whether the defense has established a prima facie case of purposeful racial discrimination. A trial judge may take into account not only whether a pattern of strikes against African American prospective jurors has emerged during voir dire, but also whether the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. Rodriguez, 822 So.2d at 128.

If the requisite showing has been made by the defendant, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. The second step of this process does not demand an explanation that is persuasive, or even plausible. Rather, at the second step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in a prosecutor's explanation, the reason offered will be deemed race neutral. Mitchell, 808 So.2d at 669-70. This is a burden of production, not one of persuasion. State v. Harris, 2001-0408 (La. 6/21/02), 820 So.2d 471, 473.

Faced with a race-neutral explanation, the defendant then must prove to the trial court purposeful discrimination. The proper inquiry in this final stage of the Batson analysis is whether the defendant's proof, when weighed against the prosecutor's proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present. Thus, the focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. Tilley, 767 So.2d at 12. The ultimate burden of persuasion is on the defendant. State v. Young, 551 So.2d 695, 698 (La. App. 1st Cir. 1989). The trial court should examine all of the available evidence in an effort to discern patterns of strikes and other statements or actions by the prosecutor during voir dire that support or reject a finding of discriminatory intent. Tilley, 767 So.2d at 12-13.

16

In the instant case, two <u>Batson</u> objections were urged. Defendant's first <u>Batson</u> objection was urged after the second panel of jurors was questioned. The record contains no information about the number of African American jurors on the first panel. There were four African American jurors on the second panel.[FN 4] Millie Davis was successfully challenged for cause by the defense due to her stated inability to sit in judgment of anyone. The trial judge also noted that she was ill. Linda Joseph was accepted as a juror by both the state and the defense. George Nevis, III, and Christopher Williams were peremptorily challenged by the state.

> [FN 4] Millie Davis; George Nevis, III; Linda Joseph; and Christopher Williams were on the second panel.

After the state peremptorily challenged Williams, defense counsel urged a <u>Batson</u> objection alleging that the state was using its peremptory challenges in a discriminatory manner to exclude African Americans from the jury and asking that the state give race-neutral reasons for his challenges of Nevis and Williams. The trial court noted that the prospective jurors on the first panel were not questioned about their race, so the court asked how defense counsel could establish a pattern of racial discrimination if there was no record of the racial composition of the first panel. Before the trial court could rule on whether defendant had demonstrated a prima facie case of racial discrimination, the assistant district attorney stated that he peremptorily challenged Nevis because of Nevis's uncertainty about whether he might be related to defendant. The assistant district attorney also stated that he peremptorily challenged Williams because of Williams's own belief that he might be too young to sit on a jury. The trial court responded that it found no pattern of racial discrimination and that the assistant district attorney offered sufficient race-neutral reasons for both jurors that he excused.

Defendant also urged a <u>Batson</u> objection after the state peremptorily challenged Annie Faulks, a member of the third jury panel who was characterized by defense counsel as African American. Although Faulks was described as African American by defense counsel, she was never questioned on the record about her race. In fact, none of the members of the third jury panel were at all questioned about their race, so the racial composition of this panel, too, is unknown. In support for his second <u>Batson</u> objection, defendant argued only that two African American members of the second panel were peremptorily challenged by the state. The trial court denied defendant's second <u>Batson</u> objection, noting that it found the previous peremptory challenges to be race neutral and that the state's peremptory challenge of Faulks did nothing to establish a pattern of racial discrimination. Defendant now argues that the trial court erred in its conclusion that there was no pattern of racial discrimination shown in the state's peremptory challenges of Nevis, Williams, and Faulks.

Considering the record as a whole, we cannot conclude that the trial court erred in denying both of defendant's <u>Batson</u> objections. We note first that the record is largely devoid of any information concerning the race of most prospective jurors. Each jury panel had eighteen members. The record provides no information about the racial composition of the first or third panel, outside of defense counsel's

description of Faulks as African American. This dearth of information makes it difficult for this Court to review defendant's *pro se* assignments of error.

We do note, however, that the second panel was composed of four individuals who identified themselves as at least partially African American.[FN 5] Of the African American members of the second panel, one was successfully challenged for cause by the defense; one was accepted as a juror; and two were peremptorily challenged by the state. Defendant's first <u>Batson</u> objection was supported by no stated reasons, and defense counsel merely asked the state to provide race-neutral reasons for its peremptory challenges of Nevis and Williams. Because defendant made no attempt to make a prima facie case of racial discrimination with respect to his first <u>Batson</u> challenge, this objection was properly denied by the trial court. Defendant's second <u>Batson</u> objection was supported only by statistics related to the peremptory challenges exercised by the state on jurors in the second panel. However, the Louisiana Supreme Court has noted that a defendant's "reliance on bare statistics to support a prima facie case of ... race discrimination is misplaced." <u>State v. Duncan</u>, 99-2615 (La. 10/16/01), 802 So.2d 533, 550, <u>cert. denied</u>, 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002). Defendant offered no further support, outside of statistics, with respect to his second <u>Batson</u> challenge, so this objection was also properly denied by the trial court.

> [FN 5] Nevis answered that he was partially African American and partially American Indian.

For the above reasons, we reject defendant's claim that the trial court erred in ruling that defendant failed to establish a pattern of racial discrimination under <u>Batson</u>. For the same reasons, we also reject defendant's claim that the state violated "defendant's equal protection rights under the Sixth and Fourteenth Amendments by its use of peremptory challenges to strike three African Americans from the jury." Defendant's *pro se* assignments of error are without merit.[24]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning reasons.[25]

In <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), the United States Supreme Court held:

Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.

---

[24] <u>State v. Brown</u>, No. 2011 KA 1463, 2012 WL 1012418, *7-10 (La. App. 1st Cir. Mar. 23, 2012); State Rec., Vol. 2 of 6.

[25] <u>State v. Brown</u>, 98 So.3d 827 (La. 2012); State Rec., Vol. 2 of 6.

Id. at 89 (citation and quotation marks omitted). The Supreme Court has since explained:

> Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process. Enforcing that constitutional principle, Batson ended the widespread practice in which prosecutors could (and often would) routinely strike all black prospective jurors in cases involving black defendants. By taking steps to eradicate racial discrimination from the jury selection process, Batson sought to protect the rights of defendants and jurors, and to enhance public confidence in the fairness of the criminal justice system. Batson immediately revolutionized the jury selection process that takes place every day in federal and state criminal courtrooms throughout the United States.
>
> In the decades since Batson, this Court's cases have vigorously enforced and reinforced the decision, and guarded against any backsliding. Moreover, the Court has extended Batson in certain ways. A defendant of any race may raise a Batson claim, and a defendant may raise a Batson claim even if the defendant and the excluded juror are of different races. Moreover, Batson now applies to gender discrimination, to a criminal defendant's peremptory strikes, and to civil cases.

Flowers v. Mississippi, 139 S. Ct. 2228, 2243 (2019) (citations omitted).

When a defendant asserts a Batson claim, the following three-step procedure is used to assess that claim:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

Snyder v. Louisiana, 552 U.S. 472, 476-77 (2008) (emphasis added; quotation marks and brackets omitted).

In this case, three panels of eighteen potential jurors each underwent voir dire as follows:

## 1. First Panel

During the first panel, the state used preemptory challenges to remove three potential jurors (Judy Richard, Catherine Wilson, and Mary Luke).[26] The races of the potential jurors were not established on the record and no Batson challenges were lodged.

---

[26] State Rec., Vol. 1 of 6, Transcript of December 14, 2009, pp. 108 and 110.

## 2.  Second Panel

During the second panel, defense counsel asked the race of each potential juror.  Of the

eighteen potential jurors on the panel, four self-identified as African-American in whole or part

(Millie Davis, Christopher Williams, Linda Joseph, and George Nevis).[27]  Defense counsel then

later asserted the first <u>Batson</u> challenge, as follows:

> BY MS. MUSTIN [defense counsel]:
>       I would like to challenge Mr. Pickett.  Out of the four African American,
> one is for cause; the others I would like him to voice race-neutral reasons for his
> challenges for Mr. Williams and George Nevis.
>
> BY MR. PICKETT [prosecutor]:
>       First of all, one of the things that has to be shown under Batson is that there
> is a pattern.  I don't think she has shown a pattern.
>
> BY THE COURT:
>       Listen up everybody, in the first panel, you didn't ask who was what color
> – and I have no idea.  There is no record and I have no idea what color anybody is.
>
> BY MR. SCHOONENBERG [defense counsel]:
>       Well, it's on the record now.
>
> BY THE COURT:
>       Huh?
>
> BY MR. SCHOONENBERG:
>       On this panel, it is on the record.
>
> BY THE COURT:
>       So how can we establish a pattern if there is no asking about it in the first
> panel?
>
> BY MR. PICKETT:
>       George Nevis said he may be related.  He said he may have problems and
> couldn't prosecute a family member.  The other guy, Mr. Williams, he said felt like
> he was too young.  I was actually going to keep him, until he said that.
>
> BY THE COURT:
>       The Court doesn't find a pattern.  Mr. Pickett has submitted race neutral
> reasons for both jurors that he has excused.

---

[27] <u>Id.</u> at pp. 174-76.

BY MS. MUSTIN:
   Please note our objection for the record.[28]

Because the prosecutor proffered his reasons for striking Nevis and Williams, the question of whether a pattern had been established was moot.  The United States Fifth Circuit Court of Appeals has explained:

> Where … the prosecutor tenders a race-neutral explanation for his peremptory strikes, the question of Defendant's prima facie case is rendered moot and our review is limited to the second and third steps of the Batson analysis.  See United States v. Broussard, 987 F.2d 215, 220 n. 4 (5th Cir. 1993) (declining to decide whether defendant had established prima facie case of racial discrimination, where district court required explanation for peremptory strikes).

United States v. Williams, 264 F.3d 561, 571 (5th Cir. 2001); see also Hernandez v. New York, 500 U.S. 352, 359 (1991) (plurality opinion) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

Therefore, this Court will proceed directly to the second step where the issue is whether the prosecutor's articulated reasons for exercising the strikes were "race neutral."  Snyder, 552 U.S. at 476.  This step does not require the state to give an explanation that is persuasive, or even plausible, so long as it is not inherently discriminatory.  Purkett v. Elem, 514 U.S. 765, 768 (1995).  For example, "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause."  Batson, 476 U.S. at 97.  The Supreme Court has explained that "[a] neutral explanation in the context of our analysis here means an explanation based on *something other than* the race of the juror.  At this step of the inquiry, the issue is the *facial validity* of the prosecutor's explanation.  Unless a discriminatory intent is *inherent* in the prosecutor's

---

[28] Id. at pp. 189-90.

explanation, the reason offered will be deemed race neutral." <u>Hernandez</u>, 500 U.S. at 360 (emphasis added). Here, the prosecutor's stated reasons for removing Nevis and Williams were not inherently indicative of discriminatory intent: Nevis was removed because he stated that he may be related to petitioner;[29] Williams was removed because he stated that he felt he was too young to serve on the jury.[30] Because those reasons were not inherently discriminatory and were facially valid, the second step was satisfied.

At the third step, the trial judge must evaluate "the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." <u>Rice v. Collins</u>, 546 U.S. 333, 338 (2006). That burden can be met in a number of ways. The United States Supreme Court has explained:

> Our precedents allow criminal defendants raising <u>Batson</u> challenges to present a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race. For example, defendants may present:
>
> - statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;
> - evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;
> - side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;
> - a prosecutor's misrepresentations of the record when defending the strikes during the <u>Batson</u> hearing;
> - relevant history of the State's peremptory strikes in past cases; or
> - other relevant circumstances that bear upon the issue of racial discrimination.

<u>Flowers</u>, 139 S. Ct. at 2243.

---

[29] <u>Id.</u> at pp. 153-54 ("I'm related to some Browns in Houma; but I'm not sure if I'm related to him. … Through the Brown/Nixon families.").

[30] <u>Id.</u> at p. 177 ("I guess I think I am too young, really to serve, because I don't have much, like life experience and I – I mean, I been through the least amount of stuff than most of the juries here. I mean, that's why I rarely answered, because I mean, I'm only 18. 18 is still a kid.").

In the instant case, defense counsel failed to make any effort whatsoever to present such evidence. Therefore, as noted, the trial judge found that the prosecutor did not exercise his peremptory strikes in a discriminatory manner. That was a finding of *fact* and, as such, must be reviewed under the AEDPA's specific and highly deferential standard of review applicable to factual determinations:

> Under AEDPA, … a federal habeas court must find the state-court conclusion "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Thus, a federal habeas court can only grant [the petitioner's] petition if it was *unreasonable* to credit the prosecutor's race-neutral explanations for the <u>Batson</u> challenge. *State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by "clear and convincing evidence."* § 2254(e)(1).

<u>Rice</u>, 546 U.S. at 338-39 (2006) (emphasis added). Even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, … on habeas review that does not suffice to supersede the trial court's credibility determination." <u>Id.</u> at 341-42. "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." <u>Wood v. Allen</u>, 558 U.S. 290, 301 (2010).

Defense counsel at trial and petitioner in his federal application made no effort whatsoever to establish that the prosecutor's proffered reasons were spurious and that his actual reasons for removing Nevis and Williams were based on their race. For example, no effort was made to assert a comparative-analysis argument by identifying any non-minority jurors who, like Nevis, were possibly related to petitioner or, like Williams, were especially young.[31] Likewise, no effort was

---

[31] The United States Supreme Court has explained:

> Comparing prospective jurors who were struck and not struck can be an important step in determining whether a <u>Batson</u> violation occurred. The comparison can suggest that the prosecutor's proffered explanations for striking black prospective jurors were a pretext for discrimination. When a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack panelist who is permitted to serve, that is evidence tending to prove purposeful discrimination. Although a defendant ordinarily will try to identify a similar white prospective juror

made to establish that the prosecutor subjected Nevis and Williams (or any of the minority jurors) to markedly different questioning than the non-minority jurors.[32]  In the absence of any such efforts, it simply cannot be said that defense counsel met her burden of persuasion on this issue at trial or that petitioner has met his burden to produce the clear and convincing evidence necessary to rebut the presumption of correctness attached to state court's finding of no discrimination in this federal proceeding.  Accordingly, honoring that presumption of correctness attached to the state court's factual finding and applying the deferential standards of review mandated by the AEDPA, this Court should deny petitioner's <u>Batson</u> claim as to the second panel.

### 3.  Third Panel

Because eleven jurors were selected from the first two panels, only one juror and one alternate remained to be picked from the third panel.[33]  From that panel, the prosecutor exercised a peremptory challenge to remove Annie Faulks, an action which prompted another <u>Batson</u> challenge by the defense as follows:

> BY MR. PICKETT:
>     State would excuse Ms. Faulks.

---

whom the State did not strike, a defendant is not required to identify an *identical* white juror for the side-by-side comparison to be suggestive of discriminatory intent.

<u>Flowers</u>, 139 S. Ct. at 2248-49 (citations and quotation marks omitted).

[32] The United States Supreme Court has explained:

> [T]his Court's cases explain that disparate questioning and investigation of prospective jurors on the basis of race can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race.  In other words, by asking a lot of questions of the black prospective jurors or conducting additional inquiry into their backgrounds, a prosecutor can try to find some pretextual reason – any reason – that the prosecutor can later articulate to justify what is in reality a racially motivated strike.  And by not doing the same for white prospective jurors, by not asking white prospective jurors those same questions, the prosecutor can try to distort the record so as to thereby avoid being accused of treating black and white jurors differently.  Disparity in questioning and investigation can produce a record that says little about white prospective jurors and is therefore resistant to characteristic-by-characteristic comparisons of struck black prospective jurors and seated white jurors.  Prosecutors can decline to seek what they do not want to find about white prospective jurors.

<u>Id.</u> at 2247-48 (citation omitted).

[33] State Rec., Vol. 1 of 6, Transcript of December 14, 2009, p. 191.

BY MS. MUSTIN:

     Your Honor, I would like to note for the record, that Ms. Faulks is a black juror.

BY THE COURT:

     I have not heard any testimony that she is a black juror.

BY MS. MUSTIN:

     We can all look at her and see that she is.

BY THE COURT:

     I am not – if you want to make a statement about that, I'm not going to – race should not play a part in jury selection, but – the law is what it is.

BY MR. SCHOONENBERG:

     We would exercise a Batson challenge, and request a race neutral reason –

BY THE COURT:

     It is your duty; and I will not state her race.  If y'all want to make a statement, that's fine.

BY MS. MUSTIN:

     Seeing that Ms. Faulks is the only African American.  She is our second juror on the panel.  And looking at her right now, she has black hair that is graying, and her skin tone is definitely African American.  So she definitely looks African American.

BY THE COURT:

     And the reasons for –

BY MR. PICKETT:

     Before I do that, you have to establish a pattern.

BY MS. MUSTIN:

     Well, going off the last time, you struck two of the four in the second panel.

BY THE COURT:

     Since no information was mentioned about anybody's race, so I don't know who is black and who is white.  And on the second panel, there was a mention; correct?

BY MS. MUSTIN:

     Correct.

BY THE COURT:
     And who was –

BY MS. MUSTIN:
     Millie Davis was black and she was challenged for cause.  Mr. Nevis was black, and then Christopher Williams was black.

BY THE COURT:
     The Court finds that the previous challenges for Batson were shown to be race neutral, by Mr. Pickett.  Now, I am – therefore, you don't have a pattern.  I don't know if you even have to do a race neutral reason –

BY MR. PICKETT:
     In order to raise Batson, you have to show a pattern.

BY THE COURT:
     That is denied.

BY MS. MUSTIN:
     Please note our objection for the record.[34]

Because the state court found that the defense had not established a prima facie case and therefore rejected this <u>Batson</u> challenge at the first step, that step must likewise be this Court's focus.

Regarding that first step, the United States Fifth Circuit Court of Appeals has observed:

<u>Batson</u> explained that to establish a prima facie case, a defendant:  (1) must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove members of that group from the venire; (2) is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate; and (3) must show that these facts and circumstances raise an inference that the prosecutor exercised peremptory challenges on the basis of race.

<u>Price v. Cain</u>, 560 F.3d 284, 286 (5th Cir. 2009) (quotation marks omitted).  "[A] prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives rise to an inference of discriminatory purpose."  <u>Johnson v. California</u>, 545 U.S. 162, 169 (footnote and quotation marks omitted).  For example, "[a]n inference may be

---

[34] <u>Id.</u> at pp. 231-33.

drawn from such circumstances as a pattern of strikes against minority venire members and the remarks made by a prosecutor during voir dire." Soria v. Johnson, 207 F.3d 232, 237 (5th Cir. 2000) (quotation marks omitted). Further, the United States Supreme Court has cautioned:

> We did not intend the first step to be so onerous that a defendant would have to persuade the judge – on the basis of all the facts, some of which are impossible for the defendant to know with certainty – that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

Johnson, 545 U.S. at 170.

As noted, the state court in the instant case found that a prima facie case had *not* been established at the first step, and that, again, is a "factual finding." See Soria, 207 F.3d at 238. "Therefore, in reviewing th[at] finding, [a federal court] must accord it a presumption of correctness, which can only be rebutted by clear and convincing evidence." Id. (quotation marks omitted).

Although the burden of establishing a prima facie case is not a particularly heavy one to meet, it is nevertheless one that is borne by the defendant. Here, the defense simply fell short. To say that the record regarding the racial composition of the venire is sketchy is to be generous – the jurors were not even questioned regarding their race on two of the three panels. Therefore, at best, the instant record shows only the following:

1.     On the first panel, the prosecutor used preemptory challenges to remove three potential jurors, but the race of those three individuals is *unknown*.

2.      On the second panel, four potential jurors self-identified as African-American in whole or in part. Of those individuals, the prosecutor successfully challenged one for cause and removed two using peremptory challenges for reasons which the trial court expressly found were *legitimate and nondiscriminatory*.

3.     On the third panel, the race of the panel members was not established on the record; however, the prosecutor used a peremptory challenge to remove one additional individual who defense counsel speculated (but did not establish on the record) was an African-American.

The question therefore is whether that final peremptory challenge was sufficiently suspicious – in light of what had preceded it – for the trial court to draw an *inference* of prima facie discrimination.  The trial court found that it was not.  Here, there is simply not enough that can be gleaned from the record for this Court to find that petitioner has presented the clear and convincing evidence necessary to rebut the presumption of correctness attached to that state court finding.  Therefore, he has not met his burden of proof, and his contention necessarily fails for that reason.

In summary, the state court rejected petitioner's <u>Batson</u> challenge as to Christopher Williams and George Nevis at <u>Batson</u>'s third step because the defense failed to meet its burden to establish purposeful discrimination and his <u>Batson</u> challenge as to Annie Faulks at <u>Batson</u>'s first step because the defense failed to meet its burden to establish a prima facie showing that Faulks had been removed on the basis of race.  Under the deferential standards of review, this Court cannot say that either the state court's underlying factual findings or its resulting legal conclusions were unreasonable.  Therefore, this claim should be denied.

### C.  Ineffective Assistance of Counsel

Lastly, petitioner claims that he received ineffective assistance of counsel at trial.  The United States Supreme Court has established a two-prong test for evaluating such claims.  Specifically, a petitioner seeking relief on such a claim is required to show *both* that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984).  The petitioner bears the burden of proof and "must

demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must consider the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

In the instant case, petitioner asserted his ineffective assistance of counsel claim on collateral review. The state district court promptly denied two of his sub-claims on the merits and ordered the state to respond to the remaining sub-claims.[35] The original district court judge then retired, and a new judge, who held four evidentiary hearings,[36] thereafter denied the remainder of the sub-claims on the merits in an exhaustively detailed, well-reasoned opinion,[37] which is quoted at length *infra*. The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application with assigning reasons.[38] The Louisiana Supreme Court thereafter likewise denied relief, simply stating: "Denied. Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[39]

Because petitioner's ineffective assistance of counsel claim was denied on the merits, and because such a claim presents a mixed question of law and fact, petitioner is entitled to federal habeas relief on the claim only if he shows that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were

---

[35] State Rec., Vol. 2 of 6, Judgment and Reasons for Judgment dated February 28, 2014.
[36] See State Rec., Vol. 3 of 6, transcripts of July 29, 2015, January 13, 2016, April 19, 2016, and August 22, 2016.
[37] State Rec., Vol. 3 of 6, Judgment and Reasons for Judgment dated January 31, 2017.
[38] State v. Brown, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6
[39] State ex rel. Brown v. State, 261 So.3d 768 (La. 2019); State Rec., Vol. 3 of 6; see also State ex rel. Brown v. State, 260 So.3d 1216 (La. 2019); State Rec., Vol. 3 of 6.

adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Ibid.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted).   The Supreme Court then explained:

Surmounting Strickland's high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under de novo review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.  *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

31

Id. at 105 (emphasis added; citations omitted).   Therefore, on habeas review of an ineffective

assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the

benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation

marks omitted).  For the following reasons, the Court finds that, under those stringently deferential

standards, it simply cannot be said that relief is warranted with respect to any aspect of petitioner's

ineffective assistance of counsel claim.

### 1.  Deprivation of Right to Testify

Petitioner first argues that his counsel was ineffective in that she deprived him of his right

to testify on his own behalf at trial.   In the post-conviction proceedings, the state district court,

after noting the Strickland standards applicable to such claims, rejected that contention, holding:

> In his first assignment of error, the defendant alleges his trial counsel's
> performance was deficient because she failed to present evidence of justification
> on the part of the defendant, i.e., that he shot the victims in this case because he
> "reasonably believed that he, his girlfriend and her two little boys were in imminent
> danger of losing their lives or in danger of receiving great bodily harm" at the hands
> of the victims.  He points out that he made this position clear to the police,
> particularly to the lead detective Dawn Foret, a state witness during whose
> testimony the defendant's audio statement was played for the jury.  At defense
> counsel's urging, the trial court instructed the jury as to the defense of justifiable
> homicide, and defense counsel argued in favor of this defense during closing
> arguments.  The gist of the defendant's complaint is not that the jury was unaware
> of this defense asserted by him, but rather, that defense counsel did not call him as
> a witness at his trial to support his claim.
>
> According to the defendant, he was "the only person who could definitively
> testify to his fear he felt for his life and the other's lives."  He alleges there was no
> risk to him if he testified because he had no prior criminal record that could used to
> impeach him.  He correctly points out that the jury already knew from his pre-trial
> statements to the police that he had used ecstasy and had sold ecstasy to Ross and
> Watkins hours before the shootings.  He complains that trial counsel encouraged
> him to remain silent at his trial, and that by successfully doing so, she failed to act
> as reasonable counsel under the circumstances because it was "absolutely essential"
> that he testify "to establish the defense of justifiable homicide."  It is clear from the
> allegations by the defendant in his post conviction relief application that ultimately
> he made the decision not to testify, but, of course, with the recommendation of his
> attorney.

At the hearing of this matter on January 13, 2016, Amanda Mustin, the defendant's trial counsel, explained that there were no defense witnesses to corroborate the defendant's claim of justifiable homicide except the defendant himself. Her obvious strategy was to rely on the defendant's pre-trial statement to the police admitted into evidence to establish the defense, rather than subjecting the defendant to in-court cross-examination by a seasoned prosecutor.

It is quite obvious that if the defendant had testified at his trial, he would have been questioned extensively by the prosecuting attorney regarding his alleged criminal activity in connection with the shootings, i.e., the distribution of ecstasy by him to Watkins and Ross. In fact, the state provoked a pre-trial hearing on December 14, 2009, for the purpose of confirming that it would be permitted to offer evidence of the defendant's drug-selling activity. Trial Transcript, pp. 254-257. While in hindsight it might be said his failure to testify about why he shot the victims was a mistake, it cannot be said his testimony definitely would have been helpful. There was a substantial possibility that this repeated testimony and elaboration by him regarding his related criminal activity, would not have endeared the defendant to the jury, and would have adversely affected his credibility. Why would defense counsel have encouraged the defendant to take such a risk when everything he had to say about why he felt justified in shooting the victims was said by him in his pre-trial statement to Detective Foret?

If an alleged error by defense counsel falls within the ambit of trial strategy, it does not establish deficient performance by counsel. Because opinions may differ on the advisability of certain tactics, hindsight is not the proper perspective for judging the competence of trial counsel's decisions. Whether a particular strategy is successful is not determinative of the issue of counsel's alleged deficiencies. State of Louisiana v. Green, 750 So. 2d 243 (La. App. 4th Cir., 1999).

Under the circumstances of this case, it does not seem far-fetched to speculate that had defense counsel encouraged the defendant to testify and he had done so, the defendant would now complain that his subsequent convictions should be overturned because that advice would have constituted ineffective assistance of counsel.

Because the court does not find that trial counsel's performance in this regard was deficient, no post conviction relief will be granted in connection with this claim.[40]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[41] and the Louisiana Supreme Court thereafter likewise denied relief, stating simply: "Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[42]

---

[40] State Rec., Vol. 3 of 6, Reasons for Judgment dated January 31, 2017, pp. 4-6.

[41] State v. Brown, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6.

[42] State ex rel. Brown v. State, 261 So. 3d 768 (La. 2019); State Rec., Vol. 3 of 6.

Here, as noted, petitioner is not alleging that his counsel prohibited him from testifying; rather, he is merely alleging that she "urged" him not to testify.[43]  At a state post-conviction hearing, petitioner testified:  "Ms. Mustin advised me that it was in my best interest to remain silent because the tape had been played for the jury, so I just took her advice and just remained silent."[44]

Where a criminal defendant "knew of his right to testify and wanted to do so but counsel was opposed [and the] defendant acquiesced in his lawyer's advice, … the only inquiry is whether that advice was sound trial strategy."  United States v. Mullins, 315 F.3d 449, 453-54 (5th Cir. 2002).  However, counsel's advice on such matters "is a 'judgment call' which should not easily be condemned with the benefit of hindsight."  Id. at 453; accord United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985); accord Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *11 (E.D. La. Mar. 20, 2008).  Further, there is a "strong presumption" that counsel's decision not to place her client on the stand was in fact a "sound trial strategy," and, to be entitled to relief, a petitioner asserting such a claim must therefore "overcome" that "strong presumption." Sayre v. Anderson, 238 F.3d 631, 635 (5th Cir. 2011).  For the following reasons, petitioner has not done so in this case.

At a post-conviction hearing, Mustin testified that the jury was already aware of the basis for the self-defense argument (namely petitioner's alleged fear of the victims) through the state's introduction of petitioner's recorded statement to the police.  Therefore, she thought it best merely to proceed with the defense based on that foundation rather than to risk subjecting petitioner to what she expected would be a grueling cross-examination simply to have him do little more than reiterate that same information:

---

[43] Rec. Doc. 1, p. 15.
[44] State Rec., Vol. 3 of 6, transcript of August 22, 2016, p. 82.

> First of all, when the statement was allowed into evidence over a motion to suppress, it wasn't too terribly bad because it was a way to get Mr. Brown's story out without the risk of him being under cross-examination.
>
> So one part of the strategy is: Let Mr. Brown tell a story through his statement where he told the detective many times over that he was afraid of these people and let the jury hear that without the fear of having to face cross-examination by the State. [45]

She further testified that she particularly feared petitioner would not fare well under such cross-examination:

> At the time, we were dealing with a situation where the prosecutor in the case was Mr. Juan Pickett, who is now a judge, but he's well-known or was well-known to be a very good prosecutor.
>
> So we had to think about that. This was a man that's been doing it for a very long time. He'd know exactly how to tear somebody up on cross-examination. So of course, this was conveyed.
>
> There's also the fear and the nervousness that a defendant might feel on the stand. I don't believe Torrell had a very – I don't think he graduated high school.
>
> So I was also concerned that someone like Mr. Pickett might be able to easily confuse him and maybe get him to say something he didn't anticipate or didn't want to say.
>
> That's where when the statement was ruled admissible in court, that's kind of where the strategy went to. [46]

The undersigned has listened to the audiotape of petitioner's statement to the police, and that audiotape underscores petitioner's challenges in trying to calmly and coherently relate his version of the events – even where the officers were questioning him gingerly and respectfully. Given that reality, counsel's anxiety over whether petitioner would fare well under a more challenging vigorous cross-examination by a seasoned prosecutor is persuasive.

Further, even under the best of circumstances, petitioner's proposed testimony that the victims were armed was unlikely to be very persuasive to the jurors because it would be (1) wholly *uncorroborated* by the other eyewitnesses who testified at trial, none of whom observed the victims with weapons, (2) characterized as *self-serving*, and (3) *inconsistent* with his own recorded

---

[45] State Rec., Vol. 3 of 6, transcript of January 13, 2016, p. 17.
[46] Id. at p. 46.

pretrial statement.  Further, it would have given the prosecutor an opportunity to relentlessly question petitioner about the fact that he admitted in his statement to using and distributing drugs – facts that would not endear him to the jury under any circumstances, but certainly not in light of the fact that children were living with him in the mobile home.[47]

Considering all of those factors, it simply cannot be said that petitioner has "overcome" the "strong presumption" that counsel's advice on this issue was a "sound trial strategy." Accordingly, this sub-claim fails.

## 2.  Failure to Object to Evidence

Petitioner's second contention is that his counsel was ineffective for failing to object to evidence, namely the audiotape of his confession.  In the post-conviction proceedings, the state district court, after noting the <u>Strickland</u> standard applicable to such claims, rejected that contention, holding:

> By way of his second assignment of error, the defendant asserts trial counsel was ineffective because she failed to object to the admission of a pre-trial, custodial taped interrogation of the defendant by the police.  According to the defendant:
>
> > "Ms. Mustin allowed the prosecution to admit into evidence a compromised tape recording of the only interview between Terrebonne Parish Sheriff's Detective Dawn Foret and defendant Torrell Brown.  Detective Foret admitted that portions of the tape were missing and claimed that the omissions were due to malfunction of the recorder….Ms. Mustin also allowed the transcript of the compromised tape recording to be introduced into evidence at the trial of Torrell Brown.  "He said that he did not see them with a gun-either of them with a gun…."  Torrell Brown specifically recalls telling Detective Dawn Foret during the tape-recorded interrogation that he saw that both Leslie Ross and Cartez [sic] Watkins were armed as they approached the trailer and beat on the door.  Mustin never filed a motion in opposition to the introduction of the tape because of the irregularities and the missing

---

[47] At a state post-conviction hearing, petitioner testified that, if given the opportunity, he would have testified at trial that "I feared for my life and *my kid's life*, so I just fired a few shots …." State Rec., Vol. 3 of 6, transcript of August 22, 2016, p. 86 (emphasis added).  He further testified that in fact two children lived in the mobile home. <u>Id.</u> at p. 134.

sections of the tape recording in which Torrell alleges that the men were carrying guns up to his door. In fact at trial she did not object specifically to admission of the compromised tape in light of the fact that Torrell Brown told her that the tape should include recordings of him repeatedly telling Detective Foret that both men were armed as they approached the trailer….Admitting the tape was contrary to the provisions contained in La. R.S. 15:450."

Detective Dawn Foret testified for the state on December 15, 2009, the second day of trial. Trial Transcript, December 15, 2009, pp. 121-154. She reported that she and Detective Mitch LeJuene interviewed the defendant in the library of the Assumption Parish Jail where he had voluntarily turned himself in. The interview took place in the evening of the same day the shootings occurred.

At trial, Detective Foret recounted the statements that the defendant made to her during the interview, including a statement that the victims, Leslie Ross and Cartez [sic] Watkins, did not have any weapons with them when they arrived at his mobile home the first time to purchase drugs from him. She also reported that the defendant told her he did not see that they had any guns with them the second time they approached his mobile home and were shot by him. The defendant described his own gun to Detective Foret, but refused to tell her what he did with the gun between the time he fled the scene and turned himself in to authorities. The gun was never found.

Detective Foret also told the jury that the interview with Torrell Brown was recorded with a hand-held, nondigital tape recorder. The audio cassette tape was introduced into evidence. When asked by the prosecutor if there was "a problem at the beginning of the tape," Detective Foret responded:

"It is obvious, when you hear the tape, it appears to be cut off, so I don't know if there was a problem with the tape, or the recorder, but the first few sentences appear to be cut off."

Apparently, the defendant claims these first few sentences were his exculpatory assertions that the victims were armed when they approached his mobile home and were shot by him.

When the state offered the tape recording as evidence, the presiding judge asked defense counsel if she had any objection. She responded: "No objection, Your Honor, other than the ones made in Pre-Trial Motions." Trial Transcript, December 15, 2009, p. 145, lines 9-11. The jury then listened to the tape recording, and copies of the transcript of the same were contemporaneously made available to them.

Contrary to the defendant's claim, defense counsel did, in fact, object to the admission of the taped statement of the defendant taken by Detective Foret. The objection was the same objection asserted in a pre-trial motion seeking to suppress the defendant's statement to Detective Foret, which motion was denied by the court after a hearing. The court has reviewed the transcript of that hearing, which was conducted between jury selection proceedings on December 14, 2009. During that

hearing, the only reference to the fact that a portion of the audiotape was inaudible was during an exchange between defense counsel and Detective Foret:

> "Q. [MS. MUSTIN] Do you know what time the interview began, because the audio recording has some glitches?
>
> A. [DETECTIVE FORET] I don't remember, and when I tried to go over it, you can't understand it on the tape. The tape is pretty messed up."
>
> Trial Transcript, December 14, 2009, p. 248, lines 8-11.

It is apparent from the transcript that the focus of the pre-trial hearing regarding the recorded statement by the defendant to Detective Foret, was whether or not the defendant made his statements freely and voluntarily, and with full awareness of his Miranda rights. No issue was raised regarding the technical deficiencies of the audio recording.

In sum, the defendant complains about the effectiveness of trial counsel because she did not object to the introduction of the "compromised" audiotape in light of the provisions of La. R.S. 15:450, which provides as follows:

> "Every confession, admission or declaration sought to be used against anyone must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford."

In connection with the defendant's post conviction relief application, the court has listened to the entire audio recording received as evidence during the defendant's trial. The forty-two minute recording was received as state exhibit S-L during the direct examination of Detective Foret. The entire recording, in its "compromised" form, was heard by the jury. The recording begins with the detective reciting the date of the recording, followed by a garbled section of various unintelligible words and phrases. The recording then picks up with the defendant answering questions which address the first events that occurred very early that morning before the shootings. Thereafter, the defendant responds to the questioning of the detective and lays out in chronological order the events that led to the shootings. At the point when the defendant describes the second approach of the victims, he does not in any way indicate they were armed. Further, at no time during the thorough questioning of the defendant captured on audiotape, much of it repetitive, did the defendant provide any information to alert the detective that the victims might have been armed. At one point Detective Foret asked the defendant directly, "Did you see any weapons in their hands?" The defendant responded, "I was scared." Detective Lejueune immediately interjected, "Did you see them with a gun?" The defendant remained silent and Detective Foret indicated the defendant was shaking his head no. The defendant then said, "I don't know what they got."

The court is convinced that no portion of the beginning, or "garbled" section, of the tape contained any assertion by the defendant that the victims in this case were armed when they approached the defendant's mobile home and were shot by him. As a result, defense counsel was not ineffective for failing to object to the state's use of the statement at trial based on any alleged violation of La. R.S. 15:450. The defendant simply did not make any exculpatory statement of the kind alleged by him in his post conviction, and, thus, there was no violation of La. R.S. 15:450, even if the "compromised" recording is considered to be less than the entirety of his statement to the detective. Under Louisiana law, a compromised or incomplete recording is not deemed inadmissible unless the missing part of the statement reflects exculpatory information. State v. Thomas, 504 So.2d 907, (La. App. 1st Cir., 1987), writ denied, 507 So.2d 225 (La., 1987).

In the alternative, even if trial counsel's failure to object to or otherwise suppress the statement at issue were to be viewed as deficient performance on her part, it cannot be said that the defendant was prejudiced by the deficiency. It is a matter of fact that the defendant never told the detective or otherwise intimated at the time of his interview, that the victims were armed.

The defendant's second assignment of error is not supported by the law or the evidence in this case.[48]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[49] and the Louisiana Supreme Court thereafter likewise denied relief, stating simply: "Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[50]

Although counsel objected to the admission of the audiotape, she did not object to it on the specific basis that petitioner now suggests, namely that the audiotape was defective because certain preliminary portions were garbled or unrecorded due to an equipment malfunction. However, that suggestion is premised on an underlying contention that those defects in the audiotape rendered it inadmissible under La. Rev. Stat. Ann. § 15:540, which requires that if a "confession, admission or declaration" is used at trial, it must be used in its "entirety." That premise is simply incorrect. The mere fact that an audiotape is imperfect or fails to capture the complete scope of an

---

[48] State Rec., Vol. 3 of 6, Reasons for Judgment dated January 31, 2017, pp. 6-10.
[49] State v. Brown, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6.
[50] State ex rel. Brown v. State, 261 So.3d 768 (La. 2019); State Rec., Vol. 3 of 6.

individual's statement does not necessarily render it inadmissible.  See State v. Bonanno, 373 So. 2d 1284, 1291 (La. 1979) (finding that tapes of telephone conversations were admissible despite the existence of a "gap" in the recording caused when the microphone fell); State v. Griffin, 618 So. 2d 680, 695-96 (La. App. 2d Cir. 1993) (rejecting a challenge to the admissibility of audiotape which, despite being offered in its entirety, was nevertheless allegedly "inaudible or incomplete in parts"); State v. Thomas, 504 So. 2d 907, 917 (La. App. 1st Cir. 1987) (holding that although "a significant portion of the defendant's taped statement was lost due to a malfunction of one of the two tape recorders," the tape was nevertheless admissible because "the remaining portion of the taped statement was played in its entirety to the jury" and "[t]here is no indication that the gaps in the tape recorded statement were caused by deliberate police conduct").

Here, the entirety of the audiotape, *as it existed*, was admitted into evidence, and there is no suggestion that the audiotape was altered or selectively edited; rather, as noted, the testimony at trial was that the defects in the audiotape simply resulted from an equipment malfunction.[51]

Moreover, as noted, the state court expressly held that any objection that the audiotape's defects rendered it inadmissible under La. Rev. Stat. Ann. § 15:450 was unfounded, and this federal habeas court must defer to that state-law determination.  Soliz v. Davis, 750 F. App'x 282, 293 (5th Cir. 2018) ("We defer to a state court's determination that an objection would have been meritless under state law because in our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law." (quotation marks omitted)), cert. denied, 139 S. Ct. 1447 (2019).

---

[51] State Rec., Vol. 2 of 5, transcript of December 15, 2009, p. 144 (testimony of Detective Dawn Foret) ("It is obvious when you hear the tape, it appears to be cut off, so I don't know if there was a problem with the tape, or the recorder, but the first few sentences appear to be cut off.").

Because the defects in the audiotape did not render it inadmissible, any objection to its admission on that basis would have been meritless.  Therefore, this sub-claim must be rejected, because "counsel cannot have rendered ineffective assistance of counsel by failing to make an objection that would have been meritless." Turner v. Quarterman, 481 F.3d 292, 298 (5th Cir. 2007).  On the contrary, "[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite." Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994).

### 3.  Failure to Introduce Victims' Criminal History

Petitioner's third contention is that his counsel was ineffective for failing to introduce evidence of the victims' criminal histories.  In the post-conviction proceedings, the state district court, after noting the Strickland standard applicable to such claims, rejected that contention, holding:

> In his third assignment of error, the defendant complains that trial counsel failed to present evidence of the criminal histories or violent reputations of the victims, Leslie Ross and Cartez [sic] Watkins.  He claims "both victims were known criminals with lengthy rapsheets" and that Leslie Ross in particular was "known by everyone including Torrell Brown to carry a pistol on his person."  He suggests that,

> > "[h]ad Ms. Mustin attempted and succeeded to introduce the fact that Leslie Ross had a reputation of carrying firearms and had in fact been arrested twice for carrying a firearm into a school, that fact alone would have supported Torrell Brown's claim of self-defense and/or justified homicide."

> La. R.S. 14:19, as it existed at the time the defendant shot the victim, Cartez Williams [sic], who did not die, declared that the use of force or violence upon Mr. Williams [sic] would have been justified under certain circumstances.  Based on all the evidence, but particularly Mr. Brown's statement to Detective Foret, none of the circumstances detailed by the statute apply in this case.
> La. R.S. 14:20, as it existed at the time the defendant shot and killed the victim, Leslie Ross, also declared that the use of force or violence upon Mr. Ross would have been justified under certain circumstances.  Again, based on all the evidence, but particularly Mr. Brown's statement to Detective Foret, none of the circumstances detailed by the statute apply in this case.

Evidence of the victims' criminal histories or violent reputations, which the defendant claims trial counsel should have offered at his trial, would not have been admissible in this case. Louisiana Code of Evidence article 404(A) establishes the general proposition that evidence of a person's character is generally not admissible to prove that he acted in conformity therewith on a particular occasion. Further, Louisiana Code of Evidence article 404(B)(1) specifically forbids evidence of other crimes, wrongs, or acts to prove the character of a person in order to show that he acted in conformity therewith. Finally, Louisiana Code of Evidence article 404(B)(2) specifically declares as follows:

> "In the absence of a hostile demonstration or overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible…."

In this case, the defendant has not suggested that any of the victims made prior threats against him. The only evidence that could have been introduced at the defendant's trial that would have in any way touched on the victim's prior criminal history or violent character, would have been evidence of the defendant's state of mind, i.e., his knowledge of their violent history or character and its effect on him. At his post conviction relief hearing on August 22, 2016, the defendant testified that he was unaware of the victims' criminal histories. In any event, such evidence is inadmissible unless there is "evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged."

A thorough review of the evidence offered in this case does not reveal any hostile demonstration or overt act on the part of the victims at the time they were shot by Mr. Brown. The evidence, including Mr. Brown' statement to Detective Foret, clearly established that Mr. Brown shot the two victims as they approached his front door, something they had done earlier that night without incident, in order to purchase illegal drugs from him. As a matter of law, Mr. Brown's subjective suspicions that the victims were up to no good was not the kind of "hostile demonstration" or "overt act" contemplated by Louisiana Code of Evidence article 404(B)(2).

Because the evidence Mr. Brown alleges should have been offered was not admissible, defense counsel was not ineffective for failing to offer the same. This assignment of error is without merit. [52]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[53] and the Louisiana Supreme Court thereafter likewise denied relief,

---

[52] State Rec., Vol. 3 of 6, Reasons for Judgment dated January 31, 2017, pp. 10-12.
[53] State v. Brown, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6.

stating simply: "Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[54]

As noted, the state court determined the victims' criminal histories would have been inadmissible under state law, and, again, this federal court must defer to such state court findings concerning issues of state law.  See Soliz v. Davis, 750 F. App'x 282, 293 (5th Cir. 2018), cert. denied, 139 S. Ct. 1447 (2019).  Further, an attorney is not ineffective for "failing to offer inadmissible evidence."  Tompkins v. Moore, 193 F.3d 1327, 1334 (11th Cir. 1999); accord Kavanaugh v. Berge, 73 F.3d 733 (7th Cir. 1996) ("[Counsel]'s failure to offer inadmissible evidence is not ineffective assistance."); cf. Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance …."); United States v. Frazier, Crim. Action No. 09-0029, 2015 WL 5595611, at *7 (M.D. La. Sept. 21, 2015) ("[A]n attorney's failure to undertake a futile action that has no chance of success does not amount to ineffective assistance of counsel.").  Therefore, this sub-claim likewise fails.

### 4.  Failure to Object to Questioning During Voir Dire

Petitioner's fourth contention is that his counsel was ineffective during voir dire, in that she failed to object to the prosecutor's improper line of questioning concerning how the prospective jurors would vote in hypothetical situations.  In the post-conviction proceedings, the state district court judge who initially considered the claim held:

> Claim IV alleges that trial counsel was ineffective in allowing the District Attorney during voir dire to repeatedly attempt to secure a commitment from the jury for a guilty verdict by using a thinly veiled analogy between the scenario presented to the jury and the District Attorney's interpretation of the facts as presented during trial.  The Court finds nothing improper in the District Attorney's questioning of the jury and would have overruled such an objection had it been made.  The Court finds no merit in Claim IV.  Therefore, Claim IV can be dismissed as failing to allege a claim entitling Petitioner to relief.[55]

---

[54] State ex rel. Brown v. State, 261 So.3d 768 (La. 2019); State Rec., Vol. 3 of 6.
[55] State Rec., Vol. 2 of 6, Reasons for Judgment dated February 28, 2014.

When responsibility for the case was latter assumed by a new judge after the former judge's

retirement, the new judge reconsidered that ruling but again denied the claim on an additional basis

as well, holding:

> This assignment of error was found to be without merit by the presiding
> judge of Division C in reasons issued on February 28, 2014.  The undersigned
> presiding judge of Division D concurs with the previous action of the court,
> principally because a review of the transcript reflecting the alleged improper voir
> dire examination of the prosecutor, reveals that defense counsel did, in fact, object.
> Trial Transcript, December 14, 2009, pp. 69-76.[56]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application

without assigning reasons,[57] and the Louisiana Supreme Court thereafter likewise denied relief,

stating simply:  "Relator fails to show that he received ineffective assistance of counsel under the

standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[58]

This claim fails because, as the second state court judge noted, counsel *did* object to the

use of the hypotheticals; her objection was simply overruled.[59]  There mere fact that counsel's

objection was overruled does not mean that she was ineffective.  See, e.g., Gonzales v. Director

TDCJ-CID, Civ. Action No. 7:18-cv-00010, 2019 WL 2271735, at *8 (N.D. Tex. Mar. 12, 2019),

adopted, 2019 WL 2269698 (N.D. Tex. May 28, 2019); Bennett v. United States, Civ. Action No.

1:10cv88 and Crim. Action No. 1:08cr78, 2011 WL 2923878, at *8 (N.D. W. Va. June 2, 2011)

("Counsel is not ineffective merely because the court overruled his objection."), adopted, 2011

WL 2909238 (N.D. W. Va. July 18, 2011).  Accordingly, this sub-claim should be denied.

---

[56] State Rec., Vol. 3 of 6, Reasons for Judgment dated January 31, 2017, p. 12.
[57] State v. Brown, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6.
[58] State *ex rel.* Brown v. State, 261 So. 3d 768 (La. 2019); State Rec., Vol. 3 of 6.
[59] State Rec., Vol. 1 of 6, transcript of December 14, 2009, p. 70.

### 5.  Failure to Preserve the Record as to the Race of the Members of the Voir Dire Panels

Petitioner's fifth contention is that his counsel was ineffective for failing to preserve the record by noting the race of the voir dire panels members for purposes of a Batson claim.  In the post-conviction proceedings, the state district court, after noting the Strickland standard applicable to such claims, rejected that contention, holding:

> The defendant also complains that his trial counsel was ineffective because she failed to have the trial record reflect the races of the jurors examined during voir dire.  This one paragraph complaint paragraph reads as follows:
>
> > "Ms. Mustin failed to determine the race of jurors and have the trial Court place the race of the jurors into the record during voir dire in order to mount a successful object to Assistant District Attorney Pickett's peremptory challenges during voir dire.  Those peremptory challenges by Assistant District Attorney Pickett were obviously intended to keep blacks from serving on the jury."
>
> The court notes that on appeal the defendant urged a pro se assignment of error, by which he complained that the trial court erred in denying his Batson challenges, finding that defense counsel failed to establish a pattern of racial discrimination.   In its March 23, 2012, opinion upholding the defendant's convictions and sentences, the First Circuit Court of Appeal pointed out that two Batson objections were urged by defense counsel at trial, one during the voir dire examination of each of the second and third jury panels called.  No Batson challenges were asserted by the defense with regard to the members of the first panel of jurors.
> The first Batson challenge by the defense occurred during the peremptory challenge process at the conclusion of the voir dire examination of the second panel of eighteen jurors.  Four of the prospective jurors self-identified as at least partially black.  One was excused for cause and one was accepted as a juror.  The remaining two were peremptorily challenged by the state.  After the second challenge, defense counsel asserted a Batson objection.  The prosecutor then indicated that defense counsel had not stated for the record any pattern of racial discrimination.  The trial court then interjected without prompting from anyone that the record was devoid of any attempt to establish the race of each potential juror on the first panel, and implied that, for that reason, the defense would have a difficult time establishing a pattern of racial discrimination.  When defense counsel suggested that a pattern could be established solely by the state's exercise of peremptory challenges with regard to the second panel only, the prosecutor immediately offered race neutral reasons for the two challenges and those reasons were accepted by the court, in effect denying the Batson challenge.  The presiding judge stated:

"The Court doesn't find a pattern. Mr. Pickett has submitted race neutral reasons for both jurors he has excused."

Trial Transcript, December 14, 2009, p. 190, lines 9-12.

A fair reading of the above exchange reveals that defense counsel made a Batson challenge. The requirement that defense counsel contemporaneously establish the prerequisite discriminatory pattern was then disregarded by the trial court because the prosecutor proffered race neutral reasons for his striking of the jurors, reasons which were acceptable by the court, even if the pattern had been established. As a result, any failure of defense counsel to establish the race of the members of the first panel had no bearing on the trial court's denial of the Batson objection.

The defense made a second Batson challenge during the challenge process of the third panel of jurors when the prosecutor peremptorily challenged one juror identified by defense counsel as black. The trial court found that the previous challenges of black jurors by the state could not be used to establish a pattern of racial discrimination by the state with regard to the third panel Batson challenge because the state offered racially neutral reasons for those previous challenges, which reasons were acceptable to the court. Thus, the court found that, assuming the final juror was black, there was nothing to indicate a pattern of racial discrimination, and the Batson objection was denied.

The defendant has not offered any evidence to show the race of any potential juror from any of the three panels called for examination at his trial. He has implied in his post conviction application that black members of the first jury panel were peremptorily challenged by the state. If true, this fact might have bolstered his trial counsel's argument that there was a pattern of racial discrimination. But this court will not assume that there were any members of the first jury panel who were black, or that any black members of the first jury panel were challenged by the state. For all this court knows, the racial identities of the members of that first jury panel were not established for the record because none of them were black. In the absence of such evidence from the defendant during the post-conviction hearing, the court cannot say that trial counsel was ineffective or that any alleged deficiency for failing to adequate support the Batson objections actually prejudiced the defendant. This assignment is without merit.[60]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[61] and the Louisiana Supreme Court thereafter likewise denied relief,

---

[60] State Rec., Vol. 3 of 6, Reasons for Judgment dated January 31, 2017, pp. 12-14.
[61] State v. Brown, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6.

stating simply: "Relator fails to show that he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[62]

As noted by the state court, the fundamental problem with this claim is that it is based on an underlying premise that there were minority individuals excused from the first panel – a premise for which petitioner offered no evidentiary corroboration whatsoever. Moreover, at a post-conviction evidentiary hearing, defense counsel explained: "On the first panel, I did not ask the races of all the jurors to be announced. However, best of my recollection is that the jurors that were excused on that first panel were all white."[63] She further testified:

> I remember that I didn't need to make a Batson Challenge because they were all white people that were excused. And even looking back at the transcripts, some of the people I knew or have since come across in other cases, and all for except one of them, I know they were white.[64]

Because petitioner offered no evidence to rebut that testimony, he has failed to meet his burden of proof with respect to this sub-claim. Accordingly, this Court simply has no basis for finding that the state court's rejection of the sub-claim was unreasonable.

## 6. Failure to Interview and Call Witnesses

Petitioner's sixth contention is that his counsel was ineffective for failing to interview and call witnesses. In the post-conviction proceedings, the state district court, after noting the <u>Strickland</u> standards applicable to such claims, rejected that contention, holding:

> In his next assignment of error, Mr. Brown claims his trial counsel was ineffective because she failed to interview and call witnesses on behalf of the defendant. Specifically, he alleges as follows:
>
> > "Ms. Mustin failed to interview any witness or call any witnesses on behalf of Torrell Brown before and during trial. One witness that was crucial to establishing that Leslie Ross was in possession of a gun when he was shot by Jamal, the son of Torrell Brown's

---

[62] <u>State ex rel. Brown v. State</u>, 261 So. 3d 768 (La. 2019); State Rec., Vol. 3 of 6.
[63] State Rec., Vol. 3 of 6, transcript of January 13, 2016, p. 53.
[64] <u>Id.</u> at pp. 53-54.

girlfriend and also the person identified as having taken money from Leslie Ross's dead hand.  If he took the money why would he leave behind any other thing of value, including a hand gun[?]."

    The defendant has not suggested what testimony would have been offered by Jamal if he had been called as a witness.  He merely speculates that if Jamal took money from the hand of Leslie Ross after he was shot and killed, he would have taken any gun he have had, too.  The defendant has not offered any evidence to show that Jamal would have testified that Leslie Ross did, in fact, possess a gun either before or after he was shot by the defendant.

    The surviving victim, Cartez [sic] Watkins testified at the defendant's trial. He reported that he and Leslie Ross did not have any weapons in their possession when they went to the defendant's mobile home to purchase ecstasy from him for the second time the day they were both shot by the defendant.  According to the witness, Leslie Ross had the money to purchase the drugs.

    Another witness, a sixteen year old named Elton Smith testified at the defendant's trial.  He reported that he saw both victims immediately before they were shot by the defendant as they approached the defendant's mobile home.  He was close enough to speak to them and he did not observe either of them in possession of any weapons.

    Simone Pollard, a thirteen year old at the time the defendant shot the victims, testified at trial.  She observed Leslie Ross, shortly before he was shot, walking toward the defendant's mobile home with money in his hand.  She also saw him collapse in the street after he ran from the crime scene.  She reported that after the shooting, she and Jamal were close to Leslie Ross's body and Jamal picked up the money formerly in the possession of the deceased from the street and went back inside the home where he lived with the defendant.  She testified that there were no guns or other weapons on Leslie Ross as he lay in the street.

    Billy Dupre, a deputy with the Terrebonne Parish Sheriff's Office, was the first law enforcement official on the scene of the shooting on March 28, 2008.  He testified that when he first observed Leslie Ross's body in the street, an unidentified black female was kneeling next to him.  There were no guns located in the vicinity. On cross examination he admitted that by the time he arrived on the scene, there were "a good amount of people outside," and that no money was found.

    In light of the foregoing, the defendant is not entitled to post conviction relief based on his allegation that defense counsel was ineffective for failing to call Jamal as a witness.  Jamal was not called to testify at the defendant's post-conviction relief hearing to report what he would have said at trial.

    Long after the defendant filed his post conviction relief application in this case, and for the first time on the first day of the post conviction relief hearing, i.e., July 29, 2015, the defendant suggested that trial counsel was ineffective because she failed to call as a witness at trial, an individual named Johnny Smith.  A thorough review of the defendant's post conviction relief application reflecting ten assignments of error, reveals Mr. Smith's name only appears twice.  In both instances, the defendant merely lists Mr. Smith as a possible witness to support his first two assignments of error.  Obviously, for this reason, the state's fourteen page

response to the defendant's post conviction relief application does not mention Mr. Smith at all.

Nevertheless, Johnny Smith testified on July 29, 2015, for the defendant at his post conviction relief hearing. According to Mr. Smith, he was present inside Mr. Brown's mobile home at the time the defendant shot Mr. Ross and Mr. Watkins. He said that both victims were crouched down and armed with pistols as they approached Mr. Brown's trailer. According to Mr. Smith, he believes that Mr. Brown saved his life as well as his own. He testified that he never spoke to Ms. Mustin.

On cross examination, Mr. Smith explained that he had was [sic] helping the defendant work on a trailer and that he had been staying at the defendant's home for the previous two days. He was sleeping in his truck in the defendant's driveway when the defendant asked him very early in the morning while dark, to go into his mobile home where together they watched the victims across the street in anticipation of trouble. He said that after the defendant's arrest he never spoke to anyone on behalf of the defendant and he did not attend the trial.

Ms. Mustin testified on January 13, 2016. She said that many efforts were made to find Mr. Smith for the purpose of testifying at his trial. She expressed her belief, apparently based on previous information furnished to her by the defendant, that Mr. Smith committed perjury when he testified before her on July 29, 2015.

Ms. Mustin also noted that Mr. Smith gave a recorded statement to the police. At the August 22, 2016, hearing in this matter, the court received as evidence from the state, a transcript of a recorded statement given to Detective Dawn Foret and Detective Cary Bergeron of the Terrebonne Parish Sheriff's Office by Johnny Smith on March 30, 2008, less than five hours after the shootings. According to Mr. Smith, he resided at 107 Apple Street in Napoleonville. He reported that he was sleeping in his truck in the driveway of the defendant's mobile home that morning. When he woke up, he saw two males on the steps of the home being shot. According to Mr. Smith,

> "When I opened my eyes when I when I [sic] sit up in my truck if you go and look in my truck you'll see when I sit up I saw them on the steps. Next blink of the eye bam, bam, bam, bam, bam."

Mr. Smith said immediately after the shootings, he began to back out of the driveway when the defendant jumped in the back of his truck. Mr. Smith drove him some distance away and the defendant jumped out of the truck and began walking away. Mr. Smith continued to his own home.

When asked if either of the two males had a gun, or a knife, or some other weapon, Mr. Smith replied, "I can't say."

Obviously, Mr. Smith's statement to the police on March 8, 2008, is in direct conflict with his testimony at the post conviction relief hearing conducted on July 29, 2015, in several important and critical particulars. To complicate matters, a police report filed into evidence by the defendant at the post conviction relief hearing on April 19, 2016, indicates that someone claiming to be Mr. Smith called Detective Malcolm Wolfe's cell phone on April 8, 2008, and left a voice message

indicating that he was inside the defendant's mobile home standing next to the defendant at the time of the shootings.

Notably, in his statement to Detective Foret a few hours after her interview of Mr. Smith, the defendant never indicated that he had invited Mr. Smith into his mobile home or that Mr. Smith was present in the home at anytime before or during the shootings. When questioned by the police after the shootings, the defendant's girlfriend, Terica Westley, who occupied the mobile home with the defendant, never indicated that Mr. Smith was in the mobile home at any time.

Robert Brown, an investigator assigned by the public defender's office to assist Ms. Mustin, also testified at the defendant's post conviction relief hearing on April 19, 2016, and August 22, 2016. He described his efforts to locate Mr. Smith at Ms. Mustin's request prior to the trial, and efforts he made at the request of court-appointed counsel for the defendant well before Ms. Mustin was appointed. He testified that he could not find Mr. Smith, although he successfully found and interviewed other witnesses.

According to Robert Brown, his efforts to locate Mr. Smith included going to Napoleonville and Labadieville, Louisiana, in Assumption Parish, where he was thought to reside, discovering his vehicle description and license plate, and talking to several people in an effort to determine his whereabouts, including the defendant's girlfriend and the City of Napoleonville Chief of Police. Robert Brown also used a computer location program available to him, knocked on doors, and made phone calls. Despite his best efforts, Robert Brown was unable to find Johnny Smith.

The court finds that the efforts of trial counsel, especially through the investigator, Robert Brown, to locate Mr. Smith before the defendant's trial were entirely reasonable and sufficient. Her failure to locate the potential witness cannot be attributed to any lack of effort on her part. The totality of the evidence indicates that it is more probable than not that for some reason, Mr. Smith did not want to be found.

Even if he had been called to testify, it is highly unlikely that Mr. Smith's testimony would have made any difference in the outcome of the trial. If he had testified at trial as he testified at the post conviction hearing on July 29, 2015, he would have been hammered by the prosecution because of the highly contradictory nature of his statements to the police on the day of the shootings. It is highly likely his testimony would have been completely disregarded by the jury as suspicious and unreliable.

Based on the foregoing, the court will not grant the defendant post conviction relief based on his allegation that defense counsel was ineffective for failing to locate Johnny Smith and call him as a witness at his trial.[65]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[66] and the Louisiana Supreme Court thereafter likewise denied relief,

---

[65] State Rec., Vol. 3 of 6, Reasons for Judgment dated January 31, 2017, pp. 14-19.
[66] State v. Brown, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6.

stating simply: "Relator fails to show that he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[67]

With respect to the contention that counsel was ineffective for failing to interview and call Jamal Westley, the son of petitioner's girlfriend, who was in the mobile home at the time of the shooting,[68] as a witness at trial, that contention fails because petitioner simply has not met his burden of proof.

For example, where, as here, a petitioner claims that his counsel's investigation was inadequate, he must point to evidence in the record demonstrating that further investigation would in fact have revealed additional information beneficial to the defense. <u>See Moawad v. Anderson</u>, 143 F.3d 942, 948 (5th Cir. 1998); <u>see also Brown v. Dretke</u>, 419 F.3d 365, 375 (5th Cir. 2005); <u>Wilson v. Cain</u>, Civ. Action No. 06-890, 2009 WL 2163124, at *22 (E.D. La. July 16, 2009), <u>aff'd</u>, 641 F.3d 96 (5th Cir. 2011); <u>Davis v. Cain</u>, Civ. Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008). Because petitioner has not established that any additional beneficial evidence could have been discovered by interviewing Jamal, his claim is wholly speculative and, therefore, necessarily fails. <u>See, e.g.</u>, <u>Perry v. Louisiana</u>, Civ. Action No. 19-13002, 2020 WL 1892794, at *19 (E.D. La. Mar. 30, 2020), <u>adopted</u>, 2020 WL 1889188 (E.D. La. Apr. 16, 2020); <u>Eaglin v. Louisiana</u>, Civ. Action No. 19-9659, 2020 WL 475770, at *25 (E.D. La. Jan. 7, 2020), <u>adopted</u>, 2020 WL 474923 (E.D. La. Jan. 20, 2020), <u>certificate of appealability denied</u>, No. 20-30081, 2020 WL 4592908 (5th Cir. Aug. 6, 2020).

With respect to the contention that counsel was ineffective for failing to call Jamal as a witness at trial, that claim fails for a similar reason. Regarding such claims, the United States Fifth Circuit Court of Appeals has explained:

---

[67] <u>State ex rel. Brown v. State</u>, 261 So. 3d 768 (La. 2019); State Rec., Vol. 3 of 6.
[68] <u>See</u> Rec. Doc. 1-1, p. 51.

Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, *we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.* This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (emphasis added; citations, quotation marks, and brackets omitted); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

Because petitioner presented no evidence whatsoever, such as by calling Jamal as a witness at any of the four state evidentiary post-conviction hearings – or even simply introducing an affidavit from him – to demonstrate that he was available to testify at the trial and would in fact have testified in a manner beneficial to the defense, petitioner has likewise failed to meet his burden of proof with respect to this aspect of his sub-claim. See, e.g., Cox v. Stephens, 602 F. App'x 141, 146 (5th Cir. 2015) (rejecting claim that counsel was ineffective for failing to call witnesses at trial, noting, "Cox has failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified; identify the content of their testimony; or support that their testimony would have been favorable"); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-

CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").[69]

With respect to the contention that counsel was ineffective for failing to interview or call Johnny Smith at trial, petitioner has presented evidence on that aspect of his claim, in that Smith was called as a witness at a post-conviction hearing. Nevertheless, that aspect of his sub-claim still fares no better. Even if Smith's information and testimony might have benefitted the defense, which is doubtful,[70] counsel cannot be faulted for failing to interview or call Smith *because he could not be located.* As noted by the state district court, both Mustin and her investigator, Robert Brown, testified at the post-conviction hearings regarding the significant efforts that were made by the defense to locate Smith.[71] Where, as here, counsel has made diligent efforts to locate a witness, she cannot be deemed ineffective simply because her efforts bore no fruit. See United

---

[69] To the extent that petitioner may also be faulting counsel for not interviewing or calling Jamal's mother, Terica Westley, as a witness at trial, see Rec. Doc. 1-1, p. 52, that contention likewise fails for the same reasons.

[70] As noted, mere hours after the crime, Smith gave a recorded statement to Detective Lieutenant Dawn Foret and Detective Lieutenant Cary Bergeron on March 30, 2008. See State Rec., Vol. 3 of 6, Transcript of Recorded Statement of Johnny Smith. In that statement, Smith said he was in his truck when the shooting occurred. Id. at pp. 6-7. Further, when he was asked whether he saw either of the victims with "with a gun or a knife or any kind of weapon," Smith answered: "I can't say." Id. at pp. 11-12. However, at a post-conviction hearing over seven years later, Smith changed his story, saying that, if he had been called to testify, he would have said that he was with petitioner inside the mobile home when the shooting occurred and that he saw the victims approaching the mobile home with a pistol immediately prior to the shooting. State Rec., Vol. 3 of 6, transcript of July 29, 2015, pp. 16-17. Obviously, if Smith had so testified at trial, he would have been vigorously impeached with his prior recorded statement, and it is reasonable to believe that the jury would have found any such conveniently contrary testimony to aid his friend at trial to be highly suspect – especially given that fact that, in *petitioner's* recorded statement, *he likewise failed to make any mention whatsoever of Smith being inside the mobile home rather than in the truck.*

[71] See State Rec., Vol. 3 of 6, transcript of January 13, 2016, pp. 12-15 and 58-60 (Mustin); State Rec. Vol. 3 of 6, transcript of April 19, 2016, pp. 13-16 and 25-81 (Brown); State Rec., Vol. 3 of 6, transcript of August 22, 2016, pp. 12-58 (Brown).

States v. Vidales, 143 F. App'x 52, 53 (9th Cir. 2005) (an attorney's failure to locate a witness does not constitute ineffective assistance of counsel when the evidence indicates that attempts were made but the witness could not be found or was in hiding); Blair-Bey v. Nix, 44 F.3d 711, 713 (8th Cir. 1995) (counsel's failure to locate two witnesses, who did not want to be found, did not constitute deficient performance); Lovett v. Florida, 627 F.2d 706, 708 (5th Cir. 1980); Madrigal v. Dretke, No. 3:04-CV-2535, 2006 WL 1391428, at *2 (N.D. Tex. Mar. 28, 2006), adopted, 2006 WL 1409516 (N.D. Tex. May 22, 2006); cf. United States v. Cronic, 466 U.S. 648, 656 n.19 (1984) ("[T]he Sixth Amendment does not require that counsel do what is impossible...."); Franklin v. Thompson, Civ. Action No. 07–543, 2007 WL 3046642, at *11 (E.D. La. Oct. 17, 2007) ("Counsel cannot be considered ineffective for failing to accomplish the impossible.").

### 7.  Failure to Stress Significance of Evidence

Petitioner's seventh contention is that his counsel was ineffective to stress the significance of certain evidence to the jury.  In the post-conviction proceedings, the state district court, after noting the Strickland standard applicable to such claims, rejected that contention, holding:

> By way of his seventh assignment of error, the defendant alleges trial counsel was ineffective because she failed to stress to the jury the significance of certain evidence.  In particular, he alleges that Ms. Mustin did not stress to the jury the testimony of the witnesses to the effect that Leslie Ross had money in his hand before he was killed and that no money was found near his body.  He complains that Ms. Mustin did not emphasize that if someone took money before the police arrived, then someone had the opportunity to take the gun, too.
>
> It should be noted that no one who testified at trial said the victims were armed with any guns.  Even the defendant in his initial interview with Detective Foret indicated that he did not see either victim armed with a gun.
>
> The court has reviewed the transcript of defense counsel's closing argument to the jury.  She pointed out that a black female was kneeling next to Leslie Ross's body when Deputy Dupre arrived on the scene and that it was possible that evidence had been removed from the scene.
>
> The court will pretermit any determination as to whether or not defense counsel's performance was deficient with regard to this assignment of error.  Even assuming trial counsel's performance was deficient for failing to adequately stress evidence regarding the missing money and the possibility of a missing gun, the

court does not believe the defendant was prejudiced by any such deficiency. Such an error under the facts and circumstances of this case would not have been so serious as to deprive the defendant of a fair trial.

This assignment of error is without merit.[72]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[73] and the Louisiana Supreme Court thereafter likewise denied relief, stating simply: "Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[74]

This sub-claim merits little consideration. The absence of the victim's money from the crime scene was is no way comparable to the absence of a weapon. An eyewitness testified that she actually saw Watkins carrying *money*,[75] but *no* eyewitness testified that the either victim was seen carrying a *weapon*.[76] At a post-conviction hearing, Mustin explained her predicament in that regard:

> We asked some of the witnesses on the scene whether or not a gun could have been taken out of the victim's hands prior to the police arriving.
>
> We asked, I think it was maybe Major Lirette and there was another officer both were asked: Is it possible that these victims had a gun and that the gun was removed from them before you got on the scene?
>
> Both of them advised anything is possible.
>
> We asked the first little girl that got on scene that saw somebody else taking money out of the victim's hands whether or not there was a gun. She did not see a gun.
>
> There was another little boy that was also on scene, did he see a gun. He did not see a gun in the victim's hands. We tried to make some ways there's a possibility that these people were armed and that they just weren't armed when the police got there.
>
> The best we got was the officer saying it's possible he had a gun. That was the best evidence we could get. There was nobody that would verify Mr. Brown's claim that the victims had a gun.

---

[72] State Rec., Vol. 3 of 6, Reasons for Judgment dated January 31, 2017, pp. 19-20.

[73] State v. Brown, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6.

[74] State ex rel. Brown v. State, 261 So. 3d 768 (La. 2019); State Rec., Vol. 3 of 6.

[75] State Rec. Vol. 2 of 6, Transcript of December 15, 2009, p. 37 (testimony of Simone Pollard).

[76] State Rec. Vol. 2 of 6, Transcript of December 15, 2009, pp. 37 and 46 (testimony of Simone Pollard); id. at pp. 191-92 (testimony of Elton Smith).

And, in fact, in his own statement, he didn't say to the detectives that the victim had a gun. In fact, when the officer said, did he have a gun, he shook his head, no, apparently, because the detective said, you're shaking your head no. And he never corrected her.[77]

Considering the absence of any testimony by any eyewitness that either victim had a weapon, Mustin had few options available to her to ensure the jury was aware that it was nevertheless still *possible* that they were armed. She chose the best of those options: she successfully extracted concessions from the investigating officers that it was possible that a weapon had been removed from the scene before they arrived[78] and then reiterated those concessions in her closing argument.[79] Given that she had absolutely nothing else to work with on this point, the Court simply cannot say that she performed deficiently in this respect or that any prejudice resulted from her performance.

### 8. Failure to Object to Jury Instruction Concerning Self Defense

Petitioner's eighth contention is that his counsel was ineffective for failing to object to the court's jury instruction concerning self defense. In the post-conviction proceedings, the state district court rejected that contention, holding:

> Claim VIII asserts that trial counsel should have objected to the jury instruction that contained the language, "A person who is not engaged in unlawful activity and who is in a place where he has a right to be shall have no duty to retreat before using deadly force and may stand his ground and meet force with force". Mr. Brown contends that the jury instruction was confusing and that the jury could have assumed that because he had illegally sold drugs on the day before the shooting that he could not claim self defense. The Court finds the jury instruction clear and that there was no reason to expect the jury to conclude that Mr. Brown was unable to claim self defense because he sold drugs on the day before the shooting. Therefore, the Court finds that Claim VIII can be dismissed as failing to allege a claim entitling Petitioner to relief.[80]

---

[77] State Rec., Vol. 3 of 6, transcript of January 13, 2016, pp. 17-18.

[78] State Rec., Vol. 2 of 6, transcript of December 15, 2009, pp. 74 (testimony of Deputy Billy Dupre) and 109 (testimony of Major LeeRoy Lirette).

[79] State Rec., Vol. 2 of 6, transcript of December 16, 2009, p. 33 ("All of the officers told you, it's possible that evidence was removed from that scene.").

[80] State Rec., Vol. 2 of 6, Reasons for Judgment dated February 28, 2014. When responsibility for the case was later assumed by a new judge after the former judge's retirement, the new judge stated:

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[81] and the Louisiana Supreme Court thereafter likewise denied relief, stating simply: "Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[82]

Here, not only was the jury instruction at issue a proper and accurate statement of the law, it was in fact an almost verbatim restatement of the applicable Louisiana statute concerning justifiable homicide. See La. Rev. Stat. Ann. § 14:20(C) ("A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force."). "Obviously, counsel cannot be considered ineffective for failing to object to a proper jury instruction." Poindexter v. Cain, Civ. Action No. 14-2267, 2015 WL 3545982, at *23 (E.D. La. June 4, 2015); cf. Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Because the instruction was proper and accurate and because petitioner's suggestion that the jurors may have found it confusing or misleading is wholly speculative and unsupported by anything in the record, this Court has no basis for finding that the state court's resolution of this sub-claim was unreasonable.

---

The presiding judge of Division C in reasons issued on February 28, 2014, found this eighth assignment of error to be without merit. The undersigned presiding judge of Division D concurs with the previous action of the court. The instruction given was in accordance with the language of La. R.S. 14:20, and was clear and precise. Despite the defendant's assertion, the instruction was not confusing.

State Rec., Vol. 3 of 6, Reasons for Judgment dated January 31, 2017, p. 20.
[81] State v. Brown, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6.
[82] State ex rel. Brown v. State, 261 So. 3d 768 (La. 2019); State Rec., Vol. 3 of 6.

### 9.  Failure to Conduct Adequate Cross-Examination

Petitioner's ninth contention is that his counsel was ineffective for failing to adequately cross-examine the state's witnesses.  In the post-conviction proceedings, the state district court, after noting the Strickland standard applicable to such claims, rejected that contention, holding:

> In his ninth assignment of error, the defendant alleges trial counsel was ineffective because she failed to adequately cross-examine prosecution witnesses. He specifically declares:

>> "Ms. Mustin failed to effectively cross-examine the witnesses that the prosecution presented at trial.  For instance, she failed to ask any of the witnesses what clothing Leslie Ross and Cartez [sic] Watkins were wearing at the time of the shooting.  Were they the customary gang baggy, saggy, banger clothing popular among young black men[?]  It is a fact that many of the criminal element wear such clothing in order to conceal weapons on their bodies."

> Apparently, the defendant suggests that identification of victims' clothing as particular [sic] useful to conceal guns would have made a difference in the verdicts returned by the jury.  The jury was well aware that the defendant himself could not confirm that either victim was armed, and that his self-defense argument was based on his subjective belief that the victims might have presented some danger to him.  Of course, the jury was aware that either or both victims could have been in possession of a concealed weapon, even while wearing what might be described as ordinary clothing.  And of course, the jury was aware that someone could have removed any weapon the dead victim possessed before the police arrived.  The jury obviously rejected those mere possibilities.
> Again, the court will pretermit any determination as to whether or not defense counsel's performance was deficient with regard to this assignment of error.  Even assuming trial counsel's performance was deficient for failing to offer evidence of the victims' clothing, the court does not believe the defendant was prejudiced by any such deficiency.  Such an error under the facts and circumstances of this case would not have been so serious as to deprive the defendant of a fair trial.
> This assignment of error is also without merit.[83]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[84] and the Louisiana Supreme Court thereafter likewise denied relief,

---

[83] State Rec., Vol. 3 of 6, Reasons for Judgment dated January 31, 2017, pp. 20-21.
[84] State v. Brown, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6.

stating simply: "Relator fails to show that he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[85]

An initial problem with this sub-claim is that is premised on an underlying fact which has not been established, namely that the victims were actually wearing clothes that were baggy or that such is indicative of gang affiliations. If they were not, then obviously counsel cannot be faulted for failing to ask such a question.

However, even aside from that unproven premise, this sub-claim also fails for the reason correctly identified by the state court: petitioner has not shown that he was prejudiced. "If [petitioner] fails to show prejudice, the alleged deficiencies in his counsel's performance need not be considered." <u>Yohey v. Collins</u>, 985 F.2d 222, 228 (5th Cir. 1993). Moreover, "[p]roving prejudice requires more than a showing that counsel's errors had some conceivable effect on the outcome of the proceeding. The likelihood of a different result must be *substantial*, not just conceivable." <u>Dorsey v. Stephens</u>, 720 F.3d 309, 321 (5th Cir. 2013) (quotation marks omitted). Here, it simply cannot be said that there is a substantial likelihood that a different verdict would have resulted even if it had been shown that the victims were so attired. Any suggestion to the contrary is wholly speculative, and "speculative allegations of ineffective assistance are not grounds for habeas relief." <u>Yowell v. Thaler</u>, 545 F. App'x 311, 314 (5th Cir. 2013).

Lastly, to the extent that petitioner is arguing that counsel was ineffective in failing to cross-examine any particular witness in any other respect, he has again failed to establish that he was prejudiced. For example, petitioner devotes several pages of his federal application to listing *other* suggested questions counsel could have asked of the various witnesses at trial.[86] However, the vast majority of those questions were either of little or no import (such as what else eyewitness

---

[85] <u>State *ex rel.* Brown v. State</u>, 261 So. 3d 768 (La. 2019); State Rec., Vol. 3 of 6.
[86] Rec. Doc. 1-1, pp. 57-63.

Simone Pollard was doing that day and whether Jamal Westley gave her any of the money he had stolen from Ross's dead body) or they were likewise premised on facts which have not been shown to exist (such as what fingerprints were found on the bullets and the doors).

Moreover, in any event, it is clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." Ford v. Cockrell, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), aff'd, 135 F. App'x 769 (5th Cir. 2005); accord Lewis v. Cain, Civ. Action No. 09-2848, 2009 WL 3367055, at *8 (E.D. La. Oct. 16, 2009), aff'd, 444 F. App'x 835 (5th Cir. 2011); Williams v. Cain, Civ. Action Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *11 (E.D. La. May 7, 2009), aff'd, 359 F. App'x 462 (5th Cir. 2009); Packnett v. Cain, Civ. Action No. 06-5973, 2008 WL 148486, at *11 (E.D. La. Jan. 10, 2008); Parker v. Cain, 445 F. Supp. 2d 685, 710 (E.D. La. 2006). Further, the United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such tactical matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689. Additionally, it is irrelevant that another attorney might have made other choices or handled such issues differently. As the Supreme Court noted: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id.

Any such second-guessing is especially inappropriate here. The undersigned has reviewed the entire trial transcript and finds that defense counsel's cross-examination of the witnesses was generally thorough and appropriate. In light of that fact, the fact that some of the proposed questions could have been interpreted as badgering otherwise sympathetic witnesses (such as the

surviving victim and Pollard, a minor), and the fact that the proposed questions were not crucial

ones which could reasonably be said to have affected the outcome of the trial, there is no basis for

this Court to find that counsel performed ineffectively in this respect.

### 10.  Other Purported Failures

Petitioner's tenth contention is that his counsel was ineffective for failing to object to the

introduction of petitioner's statement on the basis that it was involuntary due to petitioner's

intoxication, for allowing the prosecution to withhold fingerprint evidence, for failing to move for

a mistrial when the state amended the indictment at the commencement of trial, and for failing to

elicit pertinent testimony from the coroner on cross-examination.   In the post-conviction

proceedings, the state district court, after noting the <u>Strickland</u> standards applicable to such claims,

rejected that contention, holding:

> By way of this final assignment of error, the defendant claims Ms. Mustin was
> ineffective as trial counsel because she failed (1) to prevent the state from
> introducing into evidence certain pre-trial custodial statements made by the
> defendant to the police while he was intoxicated, (2) to offer exculpatory evidence,
> (3) to object to the amendment of the indictment, and (4) to adequately elicit
> testimony from the Terrebonne Parish Coroner when he testified for the state.
>
> (1) <u>Pre-trial Custodial Statements</u>
> According to the defendant, "Ms. Mustin allowed the trial Court to admit
> into evidence the statement that Torrell Brown gave to Detective Foret even though
> he was so intoxicated that he could not possibly give consent or understand the
> Miranda Warning."  As pointed out above, defense counsel did, in fact, file a pre-
> trial motion with the court seeking to suppress the defendant's pre-trial custodial
> statement given to Detective Foret.  A hearing on the motion was conducted on
> December 14, 2009.
> The court has reviewed the transcript of the hearing and it is apparent from
> the transcript that the focus of the pretrial hearing regarding the recorded statement
> by the defendant to Detective Foret, was whether or not the defendant made his
> statements freely and voluntarily, and with full awareness of his Miranda rights.
> The evidence offered by the state included testimony by Detective Foret that Mr.
> Brown told her at the time he spoke to her that he had consumed two ecstasy pills
> within twenty-four hours of the interview, the last one about fifteen hours before
> the interview.  There was no evidence of any alcohol use and Detective Foret
> testified that Mr. Brown did not appear to be under the influence of any substance.

Since the hearing in this matter, the court has listened to the entire audiotape of Detective Foret's questioning of Mr. Brown. There is nothing on the tape to cause anyone to reasonably believe that the defendant was under the influence of any substance when he spoke to the detective. It is apparent he understood the questions asked of him, and his answers were prompt and responsive.

Defense counsel was not ineffective because she "allowed the trial Court to admit into evidence the statement that Torrell Brown gave to Detective Foret." She did, in fact try to prevent the admission of the statement into evidence. It was the court who admitted the statement into evidence after hearing, a ruling which this court believes was appropriate.

(2) Exculpatory Evidence

Mr. Brown claims trial counsel was ineffective because she "allowed the prosecution to withhold evidence that would have exonerated Torrell Brown, specifically Leslie Ross, and Cartez [sic] Watkins, fingerprints on the front door of Torrell Brown's trailer." The defendant apparently believes that evidence of the victims' fingerprints on the front door of his home would have convinced the jury he was justified in shooting Mr. Ross and Mr. Watkins.

At trial, Detective Foret testified on cross-examination that to her knowledge no one with law enforcement made any effort to recover fingerprints from the front door handles of Mr. Brown's trailer. Trial Transcript, December 15, 2009, pp. 147-148. The defendant has not suggested to this court that fingerprint evidence was collected by law enforcement in this case.

Under these circumstances, it can hardly be said that this alleged exculpatory evidence exists or ever existed. Defense counsel cannot be held responsible for "allowing the prosecution to withhold evidence" when it is highly likely that such evidence never existed.

(3) Amendment of the Indictment

On December 14, 2009, the first day of trial, the state, with court permission, amended the indictment against the defendant to change the date of the offenses alleged in the indictment from April 30, 2008, to March 30, 2008. The defendant was rearraigned and entered pleas of not guilty. At that time, defense counsel objected to the state's amendment of the indictment and the court overruled the objection. Trial Transcript, December 14, 2009, p. 236, lines 10-15.

The defendant now complains that "Ms. Mustin allowed the prosecution to amend the indictment on the day of trial." His complaint is unfounded. Ms. Mustin did not "allow" the state to do any such thing. In fact, she attempted to prevent the amendment but her effort was thwarted by the trial judge. Although a proper response to the court's ruling might have been a request for a continuance of the trial, such a request would have required the defendant to show some prejudice to him caused by the amendment of the indictment. He has not suggested any such prejudice, and it appears to the court that no such prejudice existed.

(4) <u>Cross-examination of Coroner</u>

According to the defendant, Ms. Mustin was ineffective as trial counsel because she "failed to elicit testimony from the coroner concerning the kinds of and the amount of drugs in Leslie Ross' and Cartez [sic] Watkins' blood system at the time of the shooting and failed to elicit from the coroner what effects such a mixture of drugs would be expected to cause Leslie Ross and Cartez [sic] Watkins to exhibit, such as wild reckless aggressive behavior." The defendant has not suggested, what, if any, drugs might have been ingested by the victims. The court notes that two witnesses who observed the victims seconds before they were shot, Elton Smith and Simone Pollard, did not in any way indicate that the victims were engaged in any "wild reckless aggressive behavior."

Dr. Feaster Fitzpatrick, an anatomic pathologist employed by the Terrebonne Parish Coroner's Office, testified at the defendant's trial. Among other things, he performed an autopsy on the deceased, Leslie Ross, including a toxicology examination. He reported that Leslie Ross was over the legal limit for alcohol and had evidence of marijuana, amphetamine, and cocaine use. On cross-examination, Dr. Fitzpatrick testified that amphetamines includes methamphetamines, such as ecstasy. In direct response to defense counsel's questions, Dr. Fitzpatrick testified that a person with such substances in his system would be more apt to engage in reckless and aggressive behavior.

It is obvious defense counsel elicited from Dr. Fitzpatrick exactly the testimony the defendant claims she failed to elicit.

This final assignment of error is groundless.[87]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[88] and the Louisiana Supreme Court thereafter likewise denied relief, stating simply: "Relator fails to show that he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[89]

Regarding Mustin's failure to challenge the admissibility of the audiotaped pretrial statement on the basis that it was given while petitioner was intoxicated, that argument is clearly meritless. Like the state court judge, the undersigned has listened to the audiotape in its entirety,[90] and nothing about petitioner's demeanor or responses to the officers' questions gives any

---

[87] State Rec., Vol. 3 of 6, Reasons for Judgment dated January 31, 2017, pp. 21-24.

[88] <u>State v. Brown</u>, No. 2017 KW 1059, 2017 WL 4883196 (La. App. 1st Cir. Oct. 30, 2017); State Rec., Vol. 3 of 6.

[89] <u>State ex rel. Brown v. State</u>, 261 So. 3d 768 (La. 2019); State Rec., Vol. 3 of 6.

[90] <u>See Decloues v. Vannoy</u>, 735 F. App'x 132 (5th Cir. 2018) (finding that where petitioner claimed that he was "too incapacitated by drugs and sleep deprivation to knowingly and voluntarily waive his <u>Miranda</u> rights before confessing," the recording of the confession was "likely the most probative evidence for evaluating whether [the] Miranda waiver was knowing and voluntary" and should have been reviewed by the federal district court).

indication whatsoever that petitioner was intoxicated. Any challenge to the statement on this suggested basis would therefore have been patently frivolous.

Regarding the allegation that Mustin "allowed" the prosecution to withhold fingerprint evidence, there is not, as the state court correctly noted, *any* proof that such evidence in fact *existed*. When asked about this claim at a post-conviction hearing Mustin explained:

> There are no fingerprints taken. And I believe Detective Foret was asked at trial about fingerprints, and I believe she said none were taken at trial.
> So we questioned about that. We were advised by everyone that no fingerprints were ever taken.[91]

Clearly, counsel cannot be deemed ineffective for failing to obtain evidence which has not been shown to exist. See, e.g., Tabor v. Terrell, Civ. Action No. 11-1116, 2011 WL 5325544, at *15 (E.D. La. Oct. 3, 2011), adopted, 2011 WL 5325540 (E.D. La. Nov. 3, 2011).

Regarding the allegation that Mustin failed to object to the amendment to indictment, that allegation is wholly meritless. As the state court noted, Mustin *did* object; her objection was simply overruled.[92] As noted *supra*, the mere fact that counsel's objection was overruled does not mean that she was ineffective. See, e.g., Gonzales v. Director TDCJ-CID, Civ. Action No. 7:18-cv-00010, 2019 WL 2271735, at *8 (N.D. Tex. Mar. 12, 2019), adopted, 2019 WL 2269698 (N.D. Tex. May 28, 2019); Bennett v. United States, Civ. Action No. 1:10cv88 and Crim. Action No. 1:08cr78, 2011 WL 2923878, at *8 (N.D. W. Va. June 2, 2011) ("Counsel is not ineffective merely because the court overruled his objection."), adopted, 2011 WL 2909238 (N.D. W. Va. July 18, 2011). Further, given that her objection had been overruled on this issue, it would have been pointless and futile for her to then move for a mistrial on the same basis. Again, the Constitution does not require counsel to engage in futile acts.

---

[91] State Rec, Vol. 3 of 6, transcript of January 13, 2016, pp. 50-51.
[92] State Rec., Vol. 1 of 6, transcript of December 14, 2009, p. 236.

Regarding counsel' failure to request a continuance due to the amendment, she explained at the post-conviction evidentiary hearing: "I don't remember if we asked for a continuance or not. I doubt we did because I think the amendment that was made was immaterial to our strategy or immaterial to anything pertaining to trial."[93] Therefore, this sub-claim likewise fails, because "a decision on whether or not to seek a continuance is inherently one of trial strategy and, as such, is generally accorded great deference." Johnson v. Cain, Civ. Action No. 08-4208, 2009 WL 2366385, at *8 (E.D. La. July 29, 2009); Brooks v. Cain, Civ. Action No. 06-1869, 2009 WL 3088323, at *3 (E.D. La. Sept. 21, 2009). Moreover, counsel is "not ineffective for failing to move for an unnecessary continuance." Lopez v. United States, Nos. 3:12-CV-4515-D and 3:12-CR-0086-D, 2013 WL 3870020, at *4 (N.D. Tex. July 26, 2013); accord Reed v. Schriro, No. CV 04-2755, 2007 WL 521016, at *9 (D. Ariz. Feb. 14, 2007), aff'd, 290 F. App'x 982 (9th Cir. 2008).

Regarding the allegation that counsel failed to question the coroner about whether there were drugs in victims' blood systems, that aspect of the sub-claim is also patently frivolous. As the state court noted, Dr. Fitzpatrick in fact testified as to what drugs Ross had in his system and what effects such drugs could have had on his behavior.[94] As to why Mustin did not ask Dr. Fitzpatrick about whether Watkins had drugs in his system, the reason for that is obvious: as Mustin succinctly explained at a post-conviction evidentiary hearing, "I can't ask him about the drugs in the guy who wasn't dead because he never saw him."[95]

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United

---

[93] State Rec., Vol. 3 of 6, transcript of January 13, 2016, p. 51.
[94] State Rec., Vol. 2 of 6, transcript of December 15, 2009, pp. 60-62 and 64-65.
[95] State Rec., Vol. 3 of 6, transcript of January 13, 2016, p. 51.

States.  He has not made that showing in the instant case with respect to any aspect of his claim. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application seeking habeas corpus relief filed by Torrell Brown be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[96]

New Orleans, Louisiana, this ___1st___ day of February, 2021.


_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**


---

[96] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.